## THE ATCHISON, TOPEKA & SANTA FÉ RAILROAD COMPANY v. JARED CONE.

1. CASE, *Properly Settled.* Where the certificate of the trial judge and the attestation of the clerk show that a case brought to the supreme court was properly settled, signed, attested, and filed, except that the judge in his certificate used the word "allowance" instead of the word "settlement," or some cognate word, *held,* that the case will be considered as properly settled.

2. SPECIAL QUESTIONS — *Answer, " Don't Know," Error.* Where a case is tried before a court and a jury, and it is doubtful upon the evidence whether any verdict should be rendered in favor of the plaintiff; and the court submits special questions of fact to the jury for their consideration and answers, but at the same time tells the jury that where the evidence is not sufficient, they may answer the questions by saying "Don't know," or "Cannot answer on the evidence," and the jury answer a large proportion of the questions by simply saying, "Don't know," when in fact ample evidence was introduced

upon which many of such questions might have been properly an-. swered; and the questions were material; and the jury answered other questions against the evidence, and found a general verdict against the defendant for a vastly excessive amount of damages, and the court refused to require the jury to answer the foregoing questions properly, and discharged the jury: *Held*, Error, and that a new trial ought to have been granted upon the application of the defendant.

### *Error from Wyandotte District Court.*

ACTION by *Jared Cone* against *The Railroad Company*, to recover damages for personal injuries. Trial at the July Term, 1885. The jury found for the plaintiff, and assessed his damages at $50,000, the sum which he prayed for. The jury also made 136 special findings of fact, requested by the defendant company. It moved for judgment in its favor upon the findings of fact returned by the jury, notwithstanding the general verdict, which motion was overruled. Thereupon the defendant filed its motion for a new trial. Afterward, the court — the plaintiff consenting — ordered a *remittitur* of one-half of the damages aforesaid; and thereupon the court overruled the motion for a new trial, and adjudged that the plaintiff recover of the defendant $25,000 damages, together with the costs. *The Company* brings the case to this court. The opinion contains a sufficient statement of the material facts.

*Geo. R. Peck, A. A. Hurd,* and *C. N. Sterry,* for plaintiff in error.

*Thos. P. Fenlon, J. S. Ensminger,* and *Waters & Chase,* for defendant in error.

The opinion of the court was delivered by

VALENTINE, J.: This was an action brought by Jared Cone against the Atchison, Topeka & Santa Fé Railroad Company, for alleged personal injuries. The alleged injuries were received on December 5, 1883; the action was commenced on September 26, 1884; the case was tried at the July term, 1885, and was brought to this court on January 16, 1886. The de-

fendant in error, plaintiff below, moves to dismiss the action
from this court, upon the ground that it has been brought to
this court only upon a supposed case made for the supreme
court, and that such case has not been properly settled, nor
properly authenticated. The settlement of the case is shown
by the certificate and attestation of the judge and the clerk of
the court below, which reads as follows:

"The above and foregoing case-made contains a full and
complete transcript of all the evidence, papers, motions and
proceedings in the above-entitled cause; is now presented to
the judge of said court for his allowance and signature, which
is accordingly done this 6th day of January, 1886; and the
clerk of said court is hereby ordered to attest the same and
attach the seal of said court.

[Signed]      W. R. WAGSTAFF,
*Judge Tenth Judicial District for the State of Kansas.*
[Seal.]      [Signed]      Attest: L. C. TRICKEY,
*Clerk District Court, Wyandotte County, Kansas.*
Filed January 6, 1886.

[Signed]      L. C. TRICKEY, *Clerk.*"

The principal objection urged against the foregoing case is,
that in the certificate of the judge the word "allowance" is
used, instead of the word "settlement," or some cognate word,
like "settle," "settling," "settled," etc. Section 548 of the
civil code, however, uses both the words "settle" and "al-
lowed," and uses them in a way to indicate that with reference
to settling cases for the supreme court, they are nearly synony-
mous. The time for making a case for the supreme court
and for settling the same, may be extended by the court or
judge, even beyond the term of the court; and after the case
has been made, and such amendments suggested as are desired
by the adverse party, then it is provided by said section that
"the case and amendments shall be submitted to the judge,
who shall *settle* and sign the same, and cause it to be attested
by the clerk, and the seal of the court to be thereto attached;"
and "the exceptions stated in a case-made shall have the same
effect as if they had been reduced to writing, *allowed* and
signed by the judge at the time they were taken." (Civil
Code, § 548.)

We think that the case is properly authenticated, and we think that it is sufficiently shown by the certificate of the judge and the attestation of the clerk, that the case was properly settled. Whether much or little of the pleadings, much or little of the evidence, or much or little of the instructions are contained in the case, is not a matter for dismissal. If the case has been properly settled, signed, attested, filed, authenticated, and brought to this court, this court must consider it upon its merits, and cannot dismiss it.

1. Case, properly settled.

"Where a case for the supreme court is made and served upon the defendant within proper time, and is settled and signed by the judge of the district court, and properly attested and filed by the clerk, it will be presumed, in the absence of anything to the contrary, that the case was settled in accordance with the requirements of the law." (*Douglass v. Parker*, 32 Kas. 593. See also *Fearns v. A. T. & S. F. Rld. Co.*, 33 Kas. 275.)

We cannot dismiss the case from this court because of the alleged irregularities, but will have to determine the case upon its merits.

The plaintiff's home was and is at Burrton, in Harvey county, Kansas. The injuries were received at Newton, in the same county; the plaintiff's attorneys reside in Shawnee and Leavenworth counties; and this action was commenced and tried in the district court of Wyandotte county. Before any trial was had, however, the defendant asked for a change of venue, claiming, and filing an affidavit in support of the claim, that the defendant could not have a fair and impartial trial in that county; but the plaintiff resisted, and the court below overruled the application. The injuries complained of resulted from a fall from one of the defendant's railroad trains, but how the fall happened, whether from the negligence of the plaintiff, or the defendant, or both, or from pure accident, is a disputed question, and a doubtful one. This train was a passenger train operated between Kansas City and Nickerson, and was called train "No. 4" when it was going eastwardly, and train "No. 3" when it was going westwardly. James E. Corcoran was the conductor of this train, Charles W.

Chapin and the plaintiff were the brakemen, Edmund Reynard was the locomotive engineer, and Thomas O. Jones was the fireman. The plaintiff had worked for the defendant as brakeman on this train, or those trains, numbers 3 and 4, and under this conductor, for more than nine months before the accident occurred. On the evening of the accident, the train, No. 4, arrived from the west at Newton at 8:05 o'clock in the evening, and left on the same evening at 8:38 o'clock or later. At Newton, as was usual, another car, which had arrived from Wichita, was put into this train, near the rear end, and between the sleeping-car and the other cars. There were nine cars in all in this train. Just as the train left, or shortly afterward, the plaintiff fell from the train, and received the injuries of which he now complains. The alleged negligence was, the alleged starting of the train before the bell-cord was tested, without notice or signal to the plaintiff, and with a sudden jerk. It was the duty of the plaintiff to couple the bell-cord before the train was started, and it was the duty of the conductor to know from some source that the same was done before starting the train. In the present case the train was not started for about a quarter of an hour, and perhaps a half an hour, after the regular time for it to be started. The train was at Newton more than a half-hour, and perhaps nearly an hour. The plaintiff claims that just before the train was started, he went between the Wichita car and the sleeping-car and stood upon the guard-rails with a lantern in his right hand or on his right arm, and coupled the bell-rope, and was then stooping to get down, when the train started with a sudden jerk which caused him to fall; and in falling he was caught somewhere by some portion of the cars, and was carried or dragged about one thousand feet from where he fell, when he was released from the cars and left lying on the ground. Both the facts and the law with regard to all these matters, and as contended for by the plaintiff, are disputed by the railroad company.

The plaintiff was a large man, weighing at the time of the accident about 240 pounds. He weighed still more at the

time of the trial. After the accident, the plaintiff was found lying on the ground within about one thousand feet from the place where the train was started, and the lantern was found within about ten or fifteen feet from him. These trains, numbers 3 and 4, were usually started from Newton without the conductor or any other of the trainmen, except the plaintiff, knowing whether the bell-cord was coupled or not, and generally before the bell-cord was coupled; and the plaintiff, although he knew this, never complained of this to anyone, or suggested that the same was unsafe. The injuries received were the tearing of the plaintiff's clothes, the laceration of his skin on his left side, injuries to his right hand and wrist requiring the amputation of his little finger, injuries to his right leg so that it had to be amputated about four inches below the knee, and the fracture of his skull on the right side, and also loss of time and wages. His wages at the time of the accident were $55 per month. It does not appear that he was at any expense for medical aid, or assistance, or for nursing. The plaintiff in his petition claimed $50,000 damages. The jury rendered a verdict for that amount in his favor, and this, as they stated, was for "actual damages" only. The court below gave the plaintiff the option of taking a judgment for $25,000, or a new trial, and the plaintiff took the former, and judgment was rendered accordingly in his favor for $25,000 and costs. The other passenger trains of the defendant, operated between Kansas City and Nickerson, were numbered "1" and "2." Number "1" came into Newton from the east just before number "4" departed.

Numerous errors are assigned by the plaintiff in error, among which are the giving of the following instruction, and the ruling of the trial court with regard to the following special questions of fact submitted to the jury, and their answers thereto. The instruction is as follows:

"The jury are not required to answer any special question, unless they can make such answer upon the testimony they have heard; and if any question is submitted, and no sufficient evidence appears upon which to answer, the jury can say, 'Don't know,' or, 'Cannot answer on the evidence.'"

One hundred and thirty-six special questions of fact were submitted to the jury for their consideration and findings thereon, and under the foregoing instruction the jury answered the following portion of the same, in the following manner:

"14. Immediately prior to train No. 4 starting for the east on December 5th, 1883, how far was the east end of the sleeper on that train from the east end of the platform which lay between the two tracks? *Answer:* Don't know."

"18. What are the depth and width of the platforms on passenger cars on defendant's road? A. Don't know.

"19. What are the depth and width of the platforms of the Pullman sleepers? A. Don't know.

"20. When two passenger cars, or a passenger and a Pullman, with Miller couplings and platforms, are coupled together, how far apart are the two platforms from each other at the closest point, and how far apart are they at the widest point, when the slack is taken up? A. Don't know."

"24. When plaintiff fell, if he did fall, at the time of his injury, how far was he dragged by the cars before reaching the point where he was found? A. Don't know."

"26. How could plaintiff have been caught by either of the cars on train No. 4, at the time of his injury, so as to have been dragged from the point where the east end of the sleeper started to the point where plaintiff was found? A. Cannot say.

"27. As the sleeper on train No. 4, on the night of plaintiff's injury, stood by the platform between the two tracks at Newton, was there room between the north side of it and the south side of such platform to have permitted plaintiff in falling from such sleeper, or the car ahead of it, to have rolled from said platform under such sleeper? A. Don't know.

"28. At the time of plaintiff's injury, could he have fallen from any car on train No. 4, while the same was running along the platform between the two tracks, so as to have fallen under such car? A. Don't know.

"29. At the time of plaintiff's injury, could he have been dragged by any car on train No. 4 so as to have been dragged along the platform between the two tracks? A. Don't know.

"30. At the time of plaintiff's injury, could he have fallen so as to have been dragged along between any of the cars on train No. 4 and the platform between the two tracks? A. Don't know."

"37. On the night of plaintiff's injury, and prior thereto,

did not the plaintiff have from ten to twenty minutes in which to do that which he was required to do, more than he usually had at that station? A. He may have had."

"39. Was not train No. 4, on the night of plaintiff's injury, and prior thereto, moved west across Main street, at Newton, and then pulled onto the old main track, so that the sleeper, or a portion of it, was in the street? A. Don't know."

"43. If the jury answer the last question [No. 42] in the affirmative, they may state if the fireman did not, upon receiving such signal, ring the engine bell, in compliance with rule No. 17 of the company's rules, before the engine started. A. Don't know.

"44. Did not the fireman communicate the signal to start to the engineer, and did he not start the engine after the bell was rung from the engine? A. He did communicate the signals; don't know whether he rang the bell before the train started, or not."

"65. At the time of the plaintiff's injury, and immediately prior thereto, and prior to the starting of No. 4 on its journey east, was not the usual and customary warning signal that the train was about to start given before it was actually started? A. Don't know.

"66. If the jury answer the last question in the negative, they may state what signal was not given which it is usual and customary to give at that station before starting such train. A. Don't know."

"68. Did not the plaintiff at the time of, and for four months prior to his injury, know that the conductor of his train, and under whom he was working, frequently left Newton station with his train before he (said conductor) knew that the bell-cord of such train was coupled? A. Don't know.

"69. About how long did it take plaintiff, on the arrival of train No. 4 at Newton, on December 5, 1883, to do that part of his duty which consisted in helping passengers off from the train? A. Don't know.

"70. Upon the evening of December 5, 1883, after the arrival of train No. 4 at Newton, how long did it take plaintiff to help load and unload baggage, if he did help load and unload baggage? A. Don't know."

"72. If the jury answer the preceding question [No. 71] in the affirmative, they may state how long it took plaintiff to eat his supper at Newton on that evening. A. Don't know."

"75. Previous to the plaintiff's injury, and during the time plaintiff was working under Conductor Corcoran, had not

Conductor Corcoran frequently started his train from Newton without first ascertaining from the plaintiff as to whether or not the bell-cord was coupled? A. He may have.

"76. During the time plaintiff was working as brakeman under Conductor Corcoran, had not Conductor Corcoran frequently started his train from Newton without first ascertaining from plaintiff whether the train was ready to go or not? A. He may have."

"79. If the jury answer the last question [No. 78] in the affirmative, they may state if the plaintiff did not, previous to his injury, know that the conductor had frequently violated such rule in the way in which he had violated it. A. Don't know."

"82. If the jury answer the last question [No. 81] in the affirmative, they may state which foot was on the guard-rail of the Wichita car, and which foot was on the guard-rail of the sleeper. A. Cannot say."

"87. If the jury answer the last question [No. 86] in the affirmative, they may state whether a jerk toward the east of the cars upon the guard-rails of which the plaintiff was standing, while he was standing there or while he was stooping to get down, would have thrown plaintiff's head toward the east or toward the west. A. Don't know."

"93. What reason, if any, was there for not putting the Wichita car in train No. 4 at least ten minutes before train No. 4 left Newton on the evening of plaintiff's injury, if it was not placed in said train such length of time before the train left? A. Don't know."

"95. What was there to prevent train No. 4 from being all ready to leave Newton within twenty minutes after it arrived there on the evening of plaintiff's injury? State fully. A. Don't know."

"97. If the jury answer the last question [No. 96] in the affirmative, they may state what fact, if any, prevented the Wichita car from being set into train No. 4 while it stood on the new track within the usual time and in the usual manner that it had been coupled into that train theretofore. A. Don't know."

"99. Wasn't the Wichita car coupled into train No. 4, on the evening of plaintiff's injury, before Mr. McAdams and his son got upon that train? A. Don't know.

"100. Just at the time of, and immediately prior to, Mr. McAdams's leaving the car at Newton upon which he and his son were, on the evening of plaintiff's injury, didn't Mr.

McAdams know that the train was starting, or was just about to start, by feeling the movement of the car, or by hearing the bell ring on the engine? A. Don't know."

"102. Previous to plaintiff's injury, had he ever complained to Conductor Corcoran, or to any person, about Conductor Corcoran's leaving Newton station without first ascertaining from him the fact whether the bell-cord was coupled or not, or the train in readiness to go? A. Don't know.

"103. Previous to plaintiff's injury, had he made any protest to Conductor Corcoran, or to the defendant company, or any of its officers, against Conductor Corcoran's violating any duty that he may have violated in leaving Newton station at times previous thereto? A. Don't know.

"104. Prior to the night of the accident, was it not a frequent and usual occurrence for the train No. 4 to leave Newton without the signal-bell on the engine being rung from the rear coach of the train? A. Don't know.

"105. Was it not the custom at the time plaintiff was injured, and had it not been the custom for a long time prior thereto, for the trainmen to omit to ring the engine signal-bell from the rear end of the train before leaving Newton station? A. Don't know.

"106. If the jury answer the last question in the negative, they may state how often the signal-bell on the engine was rung from the rear end of the train before leaving Newton, and by whom it was so rung. A. Don't know."

"112. How long would it ordinarily take for the rear brakeman on train No. 4 to perform the duty of coupling the bell-cord between the cars at Newton? A. Don't know."

"114. After the Wichita coach was placed in the train No. 4, how long would it ordinarily take the rear brakeman to get the train in readiness to proceed on its journey? A. Don't know."

"118. Isn't it a fact that previous to plaintiff's injury, and during the time he was acting as brakeman under Conductor Corcoran in the year 1883, that Conductor Corcoran sometimes started train No. 4 from Newton east before the bell-cord of the train was coupled, after the Wichita car had been set into the train? A. Don't know.

"119. If the jury answer the last question in the affirmative, they may state if prior to plaintiff's injury he did not know that Conductor Corcoran sometimes started train No. 4

from Newton east before the bell-cord was coupled, after the
Wichita car had been taken into the train. A. Don't know."

"122. If the jury answer the last question [No. 121] in
the negative, they may state from the evidence what conductor
running a passenger train on defendant's road ever complied
with the requirements of rule No. 16 at Newton station. A.
Don't know."

"132. About how long did it take train No. 1, on entering
the Newton yards, to reach the station at Newton, on December
5, 1883? A. Don't know.

"133. About how far did train No. 1, on the evening of
December 5, 1883, have to run after it entered the east end
of Newton yards, before it reached the depot? A. Don't
know.

"134. When Cone first went into the Wichita car, after it
was coupled into train No. 4, was not the bell-cord of the
Wichita car hanging out of the west end of the Wichita car
several feet? A. Don't know.

"135. At the time mentioned in the preceding question,
was not the bell-cord of the sleeper, on the east end of it, just
pulled through over the door, and tied there? A. Don't
know."

When the jury returned their verdict and their answers to
the special questions of fact, the defendant requested the court
to require the jury to return to their room for the further consideration
of those questions which the jury had not answered
properly, and also requested the court to require the jury to
answer such questions properly, which request the court re-
fused, and discharged the jury. Of course the
court committed error in instructing the jury that
they might answer the special questions by simply
saying "Don't know," or, "Cannot answer." (*K. P. Rly. Co.
v. Peavey,* 34 Kas. 474, 486; *U. P. Rly. Co. v. Fray,* 35 id.
700, 708. See also *Clark v. Wier,* ante, p. 98; same case, 14
Pac. Rep. 534.)

2. Special questions — answer;
"Don't know,"
error.

Many of the foregoing questions were, and are, material in
the case, and with respect to many of them there was ample
evidence upon which the jury might have made proper findings.
Under the foregoing instruction the jury evidently con-

37—37 KAS.

sidered that they were at liberty to answer the questions or not, as they chose; and while the jury did not answer the foregoing questions properly, there were several other questions to which they gave answers, where their answers were clearly against the evidence. Evidently the jury acted either under a misconception of their duties, or under the influence of passion or prejudice; and probably under both. As to many questions, they did not give proper answers; as to many others, they made findings against the evidence, and they rendered a general verdict for a vastly excessive amount, and in a case where it is at least doubtful whether they should have found in favor of the plaintiff at all. Evidently when the court below required the plaintiff either to remit $25,000 of the damages found in his favor, or to take a new trial, the court must have found that the verdict of the jury was rendered under the influence of passion or prejudice. And certainly if one-half of the verdict was rendered under the influence of passion or prejudice, the other half must also have been rendered under the influence of passion or prejudice, and, as it is doubtful whether the jury should have rendered any verdict in favor of the plaintiff, it may be that this passion or prejudice affected the entire verdict and also the special findings, and caused the jury to find in favor of the plaintiff, where, except for the passion or prejudice, they would not have found in his favor at all. For the foregoing errors of the court and the jury, we think a new trial should have been granted to the defendant upon its application.

The judgment of the court below will be reversed, and the cause remanded for a new trial.

All the Justices concurring.