THE LEAVENWORTH, TOPEKA & SOUTHWESTERN RAILWAY COMPANY v. EMILY JACOBS, *as Administratrix of the estate of James Jacobs, deceased.*

SPECIAL QUESTIONS — *Answer, "Don't Know"—Erroneous Instruction.* Where a case is tried before a court and a jury, and the court submits special questions of fact to the jury for their consideration and answers, but at the same time tells the jury that when the evidence is not sufficient, they may answer the questions by saying "Don't know," and the jury answer some of the questions by simply saying "Don't know," when in fact there is evidence introduced upon which some of the questions might have been directly and properly answered; and the questions are material; and the court refuses to require the jury to make proper and direct answers to such questions, and overrules a motion to that effect, it is such an error that a new trial ought to have been granted upon the application of the defendant. The case of *A. T. & S. F. Rld. Co. v. Cone*, 37 Kas. 567, cited, and followed.

*Error from Shawnee Superior Court.*

ACTION to recover damages for the death of James Jacobs, alleged to have been caused by the negligence and carelessness

of the *Railway Company.* Trial at the January term, 1886, and judgment for the plaintiff administratrix for $575 and costs. The defendant company brings the case to this court. The opinion states the material facts.

The jury answered questions as follows:

"1. Was not the deceased, James Jacobs, at the time of the accident resulting in his death, in the employ of, and a servant of, the Leavenworth, Topeka & Southwestern Railway Company? *Ans.:* Yes.

"2. Had not the deceased several times prior to his death while on the flat cars of the construction train, passed the post and fence adjoining the cattle-guard at which he was killed? A. Yes.

"3. Were not the post and fence of the cattle-guard at which the deceased was killed plainly visible to one sitting on the flat cars and using his faculties? A. Do not know.

"4. Whilst the deceased was working for the L. T. & S. W. Rly. Co., could he not, if he had used ordinary care and exercised his faculties, discovered or seen the nearness of the posts and fences in the cattle-guards to the flat cars in the construction train? A. Jury cannot agree.

"5. If you answer the last question in the negative, state what there was to prevent his so seeing them. A. ——.

"6. Had not the deceased, while employed on the L. T. & S. W. Railway, just prior to his death, ridden upon the flat cars of the work train in going from the cut to the fill, between which points the posts and fences complained of were situated, from two to three times each day? A. Yes.

"7. At several of the times he so rode upon the flat car, did he not ride sitting upon the flat car, with his feet and legs projecting over the side? A. Do not know.

"8. If you answer the last question in the negative, then state how and in what position he did ride. A. ——.

"9. Is it not a fact that the flat car upon which deceased was, just prior to his death, had but little dirt upon it, and there was plenty of room upon it for him to take a different position; and might he not have sat or stood wholly upon the flat car, and in a safer way or manner than he did? A. Do not know.

"10. If you answer the last question in the negative, then state what were the facts, and why he could not have taken a safer position, and one in which he would not have run the risk of being struck by posts or fences. A. ——.

"11. Had not deceased been warned, just before he was struck, to lift his feet and look out for the fence or cattle-guard?   A. Jury cannot agree.

"12. Did not the workmen sometimes ride in the tool car or caboose?   A. When going to work, yes."

"14. Would the deceased, James Jacobs, have met with his death had he not sat upon the flat car and permitted his feet and legs to hang over the side thereof?   A. Don't know.

"15. Did not deceased voluntarily and of his own will sit upon the side of the flat car and let his feet hang over the side thereof?   A. Yes.

"16. Was there any necessity for deceased sitting upon the flat car with his feet hanging over?   If so, state what such necessity was.   A. Yes.   No better place provided.

"17. Was deceased ordered or directed at any time by any of his superior officers, while working for the L. T. & S. W. Rly. Co., to sit upon the side of the flat car in the manner in which he did?   A. Do not know.

"18. Was there anything in the duties of deceased which he was hired to perform, that required him to sit upon the flat car with his feet hanging over, when riding thereon?   If so, state what.   A. No.

"19. What was the height of the post and fence at the cattle-guard where deceased was killed, with reference to the flat cars?   A. About even.

"20. What was the distance between the post at the bottom and the rail?   A. About 28 inches.

"21. Was not the post of the fence at the cattle-guard where deceased was knocked off the flat car, level with the top of the flat car?   A. About.

"22. How far was the top of such post from the flat car? A. Do not know.

"23. Were there not four cattle-guard fences along the line of the L. T. & S. W. Rly., where deceased had been working for two days, similar in construction and position to the one which knocked him from the car?   A. Yes.

"24. Had not deceased, in the course of his employment there, frequently seen or had an opportunity to see the manner of the construction and position of such fences?   A. Do not know.

"25. If you answer the last question in the negative, state what there was which prevented him from knowing or seeing the manner of their construction and position.   A. ——.

" 26. Did not the accident happen to deceased in broad daylight?  A. Yes.

" 27. Did not the deceased, at some time while working with the construction train there, and prior to the time he was struck by the post or fence, know of the post or fence being there near to the track and passing flat cars while riding upon such flat cars, and did he not lift up his feet on several occasions to pass said fence or post and avoid being struck by the same?  A. Don't know.

" 28. If you answer the last question in the negative, then state how he did pass said post or fence on previous occasions, without being struck by the same?  A. ———.

" 29. Is it not a fact that the construction train upon which deceased was just prior to his death, and while deceased was upon it, and just before he was struck, running at the rate of about twelve miles an hour?  A. Yes."

" 31. While deceased was at work for the defendant, did not the conductor in charge of the gang notify the gang to look out for the cattle-guard fences?  A. Do not know.

" 32. Had not the deceased been, prior to the time of the accident, warned of the danger of the cattle-guard posts or fences?  A. Jury cannot agree."

" 34. Was not the width of the track between the rails four feet eight and one-half inches?  A. Yes.

" 35. Is not the distance outside of the wheel of the flat car to the outer edge of the car twenty-two inches?  A. Yes.

" 36. Did not the post next to the cattle-guard slant about eight inches away from the track?  A. Do not know.

" 37. Was not said post in height about on a level with the top of the flat car?  A. Yes.

" 38. How much wider is a passenger car than a flat car?  A. Twelve inches.

" 39. How far is it from the outside of the wheels of a passenger car to the outside of the car?  A. Twenty-eight inches.

" 40. How far was it from the outside of a passenger car to the top of the post that struck deceased?  A. Do not know."

*Geo. R. Peck, A. A. Hurd,* and *Robert Dunlap,* for plaintiff in error.

*Eugene Gunn,* and *Charles A. Starbird,* for defendant in error.

Opinion by SIMPSON, C.: This was an action commenced on the 13th day of August, 1885, in the superior court of Shawnee county, by Emily Jacobs, as administratrix of the estate of James Jacobs, deceased, against the Leavenworth Topeka & Southwestern Railway Company, to recover damages for the death of the intestate, caused by the negligence and carelessness of the railway company. It was tried by a jury at the January term, 1886, which returned a verdict in favor of the plaintiff below for $575, and the costs of suit. The jury returned answers to special interrogatories submitted by the court on the request of the railway company. There was a motion made before the jury were discharged, to require more specific and definite answers to be made to certain of these special questions, that was overruled and excepted to. A motion for judgment on the special findings, and a motion for a new trial, were both overruled, and excepted to by the railway company, and the case is brought here for review. The principal errors assigned are, as to certain instructions requested and refused, some that were given, and the rulings in the various motions above recited. The facts are that the deceased, James Jacobs, a bright, active young man, about seventeen years of age, sometime in the month of May, 1884, engaged to work for the railway company, and was employed in shoveling dirt on a construction train, at a point about seven miles southwest of the city of Leavenworth. He commenced to work sometime during Tuesday, and on the following Thursday, about four o'clock in the afternoon, was killed. At the time of his death he was riding on a flat car about one-third full of dirt, that was moving at the rate of about twelve miles an hour; he was sitting on the car with his legs hanging over the side of the car, and as the car was in the act of passing a post supporting the cattle-guard fence, he raised his legs to throw them over the post, but his heels struck the post, threw him around and off from the car, he falling under the wheels of the car, and being instantly killed. The construction train

and the gang with which James Jacobs was employed were at work at a cut called the "Erhart cut," and were repairing the road-bed. They were principally engaged in loading dirt on the flat cars of the construction train, and when the cars were sufficiently loaded, or when the construction train was obliged to pull out, to give way to a passenger or other train, the men would get upon the flat cars and ride to the place where the dirt would be dumped at a fill, or the flat cars would be run on a siding, and after the other train passed, would be returned to the cut. One of the fills was about a mile and three-quarters from and to the west of the cut. While the deceased was at work, they made two or three runs each way, thus passing from four to six times the post by which the injury was inflicted that resulted in the death of Jacobs. Between this cut and the fill there were three or four cattle-guards, the posts adjoining which were about as high as the top of the flat car and were from eight to nine inches from the side of the flat car at the top, with a slight slant toward the track. To such posts were attached the boards, and these together constituted the cattle-guards. In riding upon the flat cars, some of the men would ride with their legs hanging over the sides of the car, others would sit upon their shovels on the dirt in the middle of the cars, while others would stand erect.. Those riding upon the sides of the cars, as they approached these posts, would lift their feet and legs over the posts. The deceased had passed this particular post before, and in doing so had lifted his feet up over the same. There was evidence tending to show that the conductor, while Jacobs was working with the gang, and when he was present and within hearing of the remarks, warned the men against riding on the flat cars with their legs projecting over the sides, and against the dangers of the cattle-guards. The posts were set far enough away from the track to permit the passage of passenger and other cars, that are wider than flat cars, and the posts and fences were plainly visible to anyone passing them.

The court submitted a series of questions embodying, pre-

14 — 39 KAS.

sumptively, inquiries as to the most material facts in issue, and necessary to the defense of the action, at the request of the railway company.   We say that they were presumptively material, for the sole reason that they were submitted by the court, and the jury were required to answer them, and it is not to be assumed that the trial court would direct the jury to return special findings on immaterial matters.   The jury were told in the sixteenth instruction that if they could not agree respecting the proper answers to make to any of such questions, it will be sufficient to say in place of answer, "The jury do not agree."   And if they were not able to answer any particular question for want of sufficient testimony or accurate information, it will be sufficient to say, "Don't know."   The jurors seem to have availed themselves of this very liberal permission, and returned such answers to very many of the special interrogatories.   If there was not sufficient evidence to justify an answer, the questions ought not to have been submitted.   When the jurors returned their special findings, and before they were discharged, the attorneys for the plaintiff in error filed their written motion to require the jury to make direct and responsive answers to questions numbered from 3 to 11, 14, 16, 17, 22, 24, 25, 27, 28, 31, 32, 36, and 40, and this motion was overruled.   We find abundant evidence in the record, from which the jury, as we think, could easily have answered directly some of these questions.

Of course the court committed error in instructing the jury that they might answer the special questions by simply saying "Don't know," or "Cannot answer."   (*A. T. & S. F. Rld. Co. v. Cone,* 37 Kas. 567, and authorities cited.)

The practice was particularly objectionable in this case, as it is a very close question on the facts disclosed by this trial as to the liability of the railway company.

It is recommended that the judgment be reversed, and a new trial awarded.

By the Court: It is so ordered.

All the Justices concurring.