48  321
48  329

THE ST. LOUIS & SAN FRANCISCO RAILWAY COMPANY
v. EDWARD CLARK.

1. LIVE-STOCK SHIPMENT — *Negligence of Carrier* — *Evidence of Contract* — *Question for Jury.*  In an action to recover damages for the death of hogs which had been transported over the railroad, the shipper claimed and testified that an oral contract was made for transportation to a point beyond the line of the contracting company, in which there was no limitation of liability, and that the stock was shipped under that contract; that, after the stock was loaded and had left the station, he signed a paper which he could not well read, and did not read, but which he supposed to be a receipt containing nothing inconsistent with the contract under which the stock was shipped. The company contended, and offered testimony to show, that the only contract made with the shipper was the written one embodied in the paper or bill of lading signed by the shipper, and which, to a great extent, limited the liability of the company for losses that might occur.  *Held,* That the court was warranted in submitting to the jury the question of what constituted the contract of the parties, and also in defining what the common-law liability of the company was, in case they should find in favor of the theory of the shipper.

2. ———— *Insufficient Instruction.*  In charging the jury as to the common-law liability of the company, the court treated it as an insurer of the animals transported against all loss or injury from whatever cause, except the acts of God or the public enemy.  In view of the testimony tending to show that the loss may have resulted from the intrinsic qualities and propensities of the live stock transported, without the fault of the company, the court should have added a further exception, relieving the company from liability, if they found the loss or injury was attributable to the nature and propensities of the animals themselves, and which the ordinary diligence of the company could not prevent.

3. QUESTIONS — *Answers* — *New Trial.*  Where the special questions submitted to the jury are evasively and unfairly answered, and some of the findings made thereon are unsupported by the testimony, it is the duty of the trial court, upon application, to grant a new trial.

*Error from Butler District Court.*

THIS was an action brought by *Edward Clark* against *The St. Louis & San Francisco Railway Company,* to recover damages from the company for negligence in transporting a carload of stock from Andover station, in Butler county, to

21 — 48 KAS.

Kansas City, Mo. It is alleged that the company entered into a contract with Clark·to ship the stock from Andover to Kansas City, and in pursuance of the contract the company furnished a car to Clark at the station on March 30, 1888, and that Clark put into the car in good, healthy condition 60 head of fat hogs, which the company contracted to deliver.in good condition at Kansas City, but that in violation of its contract it had delivered only 44 head of hogs, and that by reason of the negligence of the company in transporting the hogs, and its failure to perform its contract, and by its delay in transporting the same and failure to deliver 16 of the hogs, the plaintiff has been damaged in the sum of $250. At the December term, 1888, a trial was had with a jury, and· a verdict was returned, awarding damages to Clark in the sum of $245.92. At the same time the jury returned into court the following answers to special questions which had been submitted :

"1. Was plaintiff's stock loaded in defendant's car at Andover station to be shipped over defendant's road to Cherryvale, and from Cherryvale over the Southern Kansas Railroad to Kansas City, Mo.? Ans. To Kansas City.

"2. Who loaded the stock in defendant's car? A. Plaintiff and others.

"3. Was the car in which said stock was put in good condition at the time the stock was loaded? A. Yes.

"4. Did the car-load of stock consist of cattle and hogs? A. Yes.

"5. How many head of hogs and how many cattle were in the car? A. Sixty hogs and four cattle."

"7. Was the car in which the stock was put a 28-foot car? A. A standard car.

"8. Was Charles Nichols, the conductor, and Ed. Baker, brakeman, in charge of the train that contained said stock from Andover to Neodesha? A. The depositions so stated."

"10. To what point on defendant's road was said stock to be shipped by defendant? A. Kansas City.

"11. Over what road was said stock to be shipped from Cherryvale to Kansas City, Mo.? A. Do n't know.

"12. How many times was the stock watered between Andover and Cherryvale? A. Do n't know.

"13. What time did the train that contained said stock leave Andover? A. About 8 A. M., March 30, 1888.

"14. What time did the train arrive at Cherryvale? A. About 5:15 to 5:25 P. M., March 30, 1888.

"15. Were the men in charge of the train that contained plaintiff's stock careful, competent and skilled men? A. Do n't know.

"16. If the jury answer the last question in the negative, they will state fully what negligence there was on the part of the men in charge of the train that caused the loss of plaintiff's hogs. A. ——.

"17. Did the men in charge of the train handle the same in a careful and competent manner? A. Do n't know.

"18. If the jury answer the last preceding question in the negative, they will state fully in what particular the men in charge of the train failed or neglected to handle said train in a competent and careful manner. A. ——.

"19. Were the hogs lost or killed by or through the negligence or carelessness of the defendant, its agents, or employés? A. Yes.

"20. If the answer of the last question be 'Yes,' state fully what the agent or employés of the defendant done or omitted to do that caused the death of the hogs. A. They failed to take proper care of them at Cherryvale.

"21. Did the hogs die beetween Andover and Cherryvale, or between Cherryvale and Kansas City? A. At Cherryvale.

"22. Did the leaving of the cattle loose in the car with the hogs in any way contribute to the injury complained of? A. No evidence that it did.

"23. Was there any negligence on the part of the defendant, its agents or employés, in handling the car of stock; if so, state fully in what such negligence consisted? A. Not taking proper care of the stock."

The company thereupon asked the court to require the jury to return answers to the 11th, 12th, 16th and 18th special questions submitted to them by the court, which request was overruled by the court and the jury discharged. Exceptions were taken to the rulings of the court. Motions were made by the company for judgment upon the special findings, and also for a new trial, both of which were overruled, and exceptions taken. The *Company* alleges error.

*George R. Peck, A. A. Hurd,* and *Robert Dunlap,* for plaintiff in error.

*Sankey, Campbell & Amidon,* for defendant in error.

The opinion of the court was delivered by

JOHNSTON, J.: On March 30, 1888, at Andover, Edward Clark engaged a car of the St. Louis & San Francisco Railway Company, and loaded thereon 60 hogs and four head of cattle for shipment to Kansas City. It appears to have been the intention to ship them by the road of the plaintiff in error to Cherryvale, and from Cherryvale to Kansas City over the Southern Kansas railroad. When the stock was unloaded from the car at Cherryvale, it was found that 16 of the hogs were dead. Clark claims that the hogs were killed by the negligence of the company, and he sues for the recovery of their value. He claims to have made a parol contract with the agent of the company on the day before the shipment was made, by which he was to have a car in which to ship stock from Andover to Kansas City for $32.20, and that in pursuance of the contract the car was furnished to and loaded by him. On the part of the company, it is contended that a written contract was entered into between the company and Clark, whereby the liability of the company for loss or damage was limited to a considerable extent. It is conceded that a paper which embodies rules and regulations for the shipment of property, and also a special contract, was signed by Clark upon the day when the stock was shipped; and it is contended by the company that that contract must be held to embody all the terms and conditions of the prior oral agreement, and is the best and only evidence of the agreement of the parties. It is therefore claimed that the court erred in defining to the jury the liability of the railroad company at common law, under the theory that the plaintiff had entered into a prior agreement not affected by the terms of the written contract, and that the case should have been

submitted to the jury, not upon the common-law liability of the railroad company, but upon its liability under the written contract. The jury were instructed that the company might by special contract relieve itself from the strict liability imposed upon it by the law, but could not contract for exemptions from the consequences of its own or its agents' negligence. The jury were also advised that—

"The plaintiff had a right and had the power to make a parol contract with the defendant to ship his hogs to Kansas City, if the defendant, by its agent, chose to so contract; and, if you find that the plaintiff drove his stock—the hogs in question—to the shipping yards of defendant, and loaded them into a car designated and set apart by the defendant for that purpose, and that the defendant received the car thus loaded into its train, coupled on to it and moved it out on its line and away from the station where loaded and on the way to its destination, all in pursuance of and in accordance with a parol contract previously made and entered into between plaintiff and defendant as to price, rate, point of destination, etc., and that, after all this had been done the defendant arbitrarily inserted in a bill of lading or written contract conditions and limitations as to liability, responsibility or point of destination not in accordance with the said parol contract, but in conflict therewith, and that the said plaintiff signed said written contract without reading it and without knowing its contents, then, and in that case, I instruct you that the parol contract will control and govern the parties and settle their rights as against said written contract, and said written contract will not supersede or overturn or destroy the parol contract between the parties."

The question of what was the contract was left to the jury, and we think from an examination of the testimony that the court was warranted in submitting this question, and in defining the common-law liability of common carriers in the transportation of property. The testimony of Clark is that a complete parol contract had been made, and the stock had been shipped, before his name was attached to the bill of lading or contract, and that after the stock was on the way to Kansas City he returned to the station and signed the paper, but was unaware that it was anything more than an ordinary receipt.

He states that he could not readily read writing, and did not read this paper or know that it contained any limitations or restrictions, or any conditions different from the contract which had been previously made and under which the stock had been shipped. He further states, that he had previously shipped stock over the road of the company from that station without any written contract, and it appears that the agent of the company admitted that stock was sometimes shipped from the station without a written contract between the company and the shipper. The agent also admits that Clark asked for a car to Kansas City, and he agreed to furnish him one, although it appears from the terms of the written contract that the company had only contracted to carry the stock from Andover to Cherryvale. This testimony was admissible, and brings the case within the rule of *Mo. Pac. Rly. Co. v. Beeson*, 30 Kas. 298.

The testimony offered in behalf of the company is in conflict with that of Clark with respect to the making of the oral contract and the shipping of the stock thereunder. The agent states that the only contract made was that which was embodied in writing, but we think the testimony was such as to require the court to present to the jury the theory of each party and the rules of law applicable to each theory, and the testimony presented to sustain the same. This question of dispute was very important in determining the rights and liabilities of the parties to this action. If the paper which was signed is a valid and controlling contract, it restricted the liability of the company to a great extent, and placed upon the shipper the burden of showing that the loss resulted from the negligence of the company. (*Railroad Co. v. Piper*, 13 Kas. 505; *Railroad Co. v. Kiff*, 32 id. 263.) On the other hand, if the stock was shipped under the parol contract, as testified to by plaintiff, the company will be held to its common-law liability; and when it is shown that the property was received by the company in good condition and was injured or destroyed before its delivery, then the burden of proof was upon the company to show facts or circumstances which would relieve

it from liability. (*McCoy v. Railroad Co.*, 44 Iowa, 424; *Hart v. Railroad Co.*, 27 Am. & Eng. Rld. Cases, 59; *Hussey v. The Saragossa*, 2 Wood, 380.) In charging the jury as to the general liability of the company under the common law, the court treated the company as an insurer of the hogs and cattle transported against all loss or injury from whatever cause, except the acts of God or the public enemy. In view of the testimony in the case, the court should have added a further exception, relieving the company from liability where the loss or injury is attributable to the nature and propensities of the animals themselves, and which the ordinary diligence of the company could not prevent. In *Evans v. Fitchburg Rld. Co.*, 111 Mass. 142, it is said:

"But the transportation of horses and other domestic animals is not subject to precisely the same rules as that of packages and inanimate chattels. Living animals have excitabilities and volitions of their own, which greatly increase the risks and difficulties of management. They are carried in a mode entirely opposed to their instincts and habits. They may be made uncontrollable by fright, or, notwithstanding every precaution, may destroy themselves in attempting to break loose, or may kill each other. If the injury in this case was produced by the fright, restiveness or viciousness of the animals, and if the defendants exercised all proper care and foresight to prevent it, it would be unreasonable to hold them responsible for the loss."

In 3 Am. & Eng. Encyc. of Law, p. 6, it is said:

"In nearly all the states the rule is now well established that the liability of carriers of live stock is the common-law liability of common carriers of other property, subject only to the qualification that the carrier may be excused from liability where the loss is attributable to the intrinsic qualities or nature of the animals, provided he is himself free from negligence, or is exempted by a valid contract protecting him." (See the many cases cited to sustain the text.) "This is in harmony with the exception to the general rule which has always existed, excusing the carrier from liability for such losses as arise by reason of some inherent defect or characteristic of the article conveyed, as for natural decay of fruit, veg-

etables, or meats, spontaneous combustion, the heating of grain, and the like." (*McCoy v. Railroad Co.*, supra.)

It is difficult to determine from the testimony in the record what caused the death of the hogs that were found dead in the car at Cherryvale. The testimony tends to show that they were in good condition when they were placed in the car; but it is shown that four head of cattle, one of which was a male animal, were placed in the car with the hogs; and Clark's own witness stated that it is not a good practice to ship loose cattle with live hogs; that they were liable to move around and worry them to a certain extent; and that a person who ships them in that way may expect to find some of the animals crippled and injured. There is some testimony which tends to show that, when fat hogs are crowded and driven around by cattle in a car, they will smother. The witnesses say that cattle shipped in the same car with hogs should be tied up, or kept separate from the hogs. Clark is unable to say that he tied the cattle when he placed them in the car with the hogs; and one witness who saw them when they arrived at Cherryvale testified that the cattle were loose in the car. This testimony required a qualification of the rule given by the court as to the common-law liability of the company.

It is further contended, that the court erred in refusing to require the jury to answer certain special questions more definitely; and there is a further contention that their answers are so evasive as to show prejudice, and warrant the court in granting a new trial. It appears from the record that the court charged the jury that they might answer special questions by simply saying, " We do n't know." This was error. (*Railroad Co. v. Cone*, 37 Kas. 577.) Some of the questions are quite material, and there was evidence upon which to found answers to them. For instance, the jury are asked how many times the stock were watered between Andover and Cherryvale, and they answered, " Do n't know," although there was undisputed testimony submitted to them that they were watered three times between those stations. The court should have required

an explicit answer to all material questions which could be readily answered from the testimony. Another question was concerning the care, competency and skill of those in charge of the train. Upon this subject there was testimony, but the answer of the jury was, "Do n't know." In another question, they were asked over what road the stock was to be shipped from Cherryvale to Kansas City, and they answered, "Do n't know," when there was testimony offered to show that it was the Southern Kansas. In answer to other inquiries, the jury found that the hogs died at Cherryvale, and that their death was caused by the failure of the employés of the company to take proper care of them at Cherryvale; while the only testimony that we can find in the record with respect to their death is, that they were in bad condition and dead upon their arrival at Cherryvale. Some of these findings are unsustained by the testimony, some of them are inconsistent with each other, and some of them are evasive. For these errors, a new trial should have been granted.

The judgment will be reversed, and the cause remanded for a new trial.

All the Justices concurring.