Mr. Justice STRONG
 

 delivered the opinion of the court.
 

 These cases have been elaborately and very ably argued, touching both the legality and the construction of the contracts under which the different parties claim. But in the view which we take of the merits of the controversy it is unnecessary to do more than to examine the contracts themselves, and to determine what is their true meaning.
 

 The fundamental question, in all the cases, is whether Elgee parted with the ownership by either of the contracts found by the Court of Claims to have been made by him, or for him by his agent, Gordon. It is the owner alone who has any standing in the Court of Claims under the Captured and Abandoned Property Act. In regard to such property, only such suits can be brought as are authorized by the statute. That statute furnishes a complete system for the pi'osecution of claims under it, and defines the extent of the rights which those who claim an interest in the proceeds of property captured or abandoned during the civil war, may assert against the government. According to the well-
 
 *186
 
 known rules of statutory construction, the system is exclusive of all others, and the rights defined are the only ones which can be enforced in any judicial proceeding. The language of the act makes it plain that no one is allowed to sue in the Court of Claims for the proceeds of captured or abandoned property unless he can prove to the satisfaction of the court three things:
 
 first,
 
 his ownership of the property seized;
 
 secondly,
 
 his right to the proceeds thereof; aftd,
 
 thirdly,
 
 that he never gave aid or comfort to the rebellion. The third, it is true, has been ruled by this court to be no longer necessary since the amnesty proclamations, but the ownership of the property at the time of the seizure, and the right to the proceeds thereof, are still indispensable to any standing in court as a claimant for the proceeds of property captured, which have been paid into the treasury of the United States.
 

 We are, then, to inquire whether either Woodruff & Co., or Haller Nutt had acquired the ownership of the cotton prior to its seizure by the agent of the United States, on the 2d of April, 1864; for if either of these parties had become the owner and entitled to the proceeds of its sale before that date, that party is entitled to a judgment for the sum remaining in the treasury, after the deductions are made provided. by the statute. If, on the other hand, neither of those parties has shown that Elgee parted with his title; if the ownership remained in Elgee until after the seizure, and until his death, his representatives are the only persons that are authorized to sue for the proceeds of the cotton in the Court of Claims, for they only are the owners, whatever equities may exist in favor of the parties who contracted to buy.
 

 We come, then, at once to the question whether Wood-ruff & Co. acquired the ownership of Elgee. If they did, it was mediately through C. S. Lobdell. They made no contract with Elgee, but Lobdell did, and they purchased Lob-dell’s contract. The contract between Lobdell and Elgee appears in the findings of the Court of Claims.
 
 *
 

 
 *187
 
 At the time when the contract was made the baled cotton was stored under a covering of boards at some place not certainly designated. A portion equal to about twenty bales unbaled was in a gin-house on Buffalo Bayou, at a place known as “ The Bocks,” or “ Felter’s Plantation,” about ten miles from the Mississippi Biver. At this latter place Lob-dell and the agent of Elgee met. Whether it was the same plaee where the bulk of the cotton was lying does not distinctly appear. Immediately after the contract Lobdell employed Morris, living near where the cotton was stored, “ to watch and take care” of it, and paid him therefor, and Morris continued his care until the cotton was seized by the agent of the United States. But it does not appear that the possession was surrendered to Morris, or that there was any change of possession. At this time, the region where the parties were was greatly disturbed by the war, and the cotton was in danger of being burnt by the Confederate forces, and of being captured by the United States. Under these circumstances, what ought it to be concluded was intended by the contract between Gordon and Lobdell? Was it intended to pass the property in the cotton to the purchaser, or was it in legal effect only an agreement to sell ?
 

 It must be admitted there is often great difficulty in determining whether a contract is itself a sale of personal property so as to pass the ownership to the vendee, or whether it is a sale, on condition, to take effect or be consummated only when the condition shall be performed, or whether it is a mere agreement to sell. It is, doubtless, true that whether the property passes or not is dependent upon the intention of the parties to the contract, and that intention must be gathered from the language of the instrument. There are, however, certain rules for the construction of such contracts, which are well settled in. England, and, we think, also in this country. Mr. Justice Blackburn, in his work on sales,
 
 *
 
 states two of them, and Mr. Benjamin, in his treatise,
 
 †
 
 adds a third. They are as follows:
 

 
 *188
 

 Mrsi. “ When,
 
 by the agreement, the vendor is to do anything to the goods for the purpose of putting them into that state in which the purchaser is bound to accept them, or, as it is sometimes worded, into a deliverable state, the performance of those things shall, in the absence of circumstances indicating a contrary intention, be taken to be a condition precedent to the vesting of the property.”
 

 Second.
 
 “ Where anything remains to be done to the goods for the purpose of ascertaining the price, as by weighing, measuring, or testing the goods, where the price is to depend on the quantity or quality of the goods, the performance of these things shall also be a condition precedent to the transfer of the property, although the individual goods be ascertained and they are in the state in which they ought to be accepted.”
 

 Third. “
 
 Where the buyer is by the contract bound to do anything as a consideration, either precedent or concurrent, on which the passing of the property depends, the property will not pass until the condition be fulfilled, even though the goods may have been actually delivered into the possession of the buyer.”
 

 These may be regarded as rules for ascertaining the intention of the parties. They are in most eases held to be conclusive tests. Though not supported by all the decisions, they certainly are generally accepted in England, and by most of the courts in this country. And they are the rules which are applicable to contracts for the sale of specific chattels, contracts which define the articles which are the subjects of agreement, either single articles or aggregates separated from others, as the grain in a bin, the hides in a specified vat, &e., &c., or such a ease as the present, all the cotton at a designated place. A considerable number of the numerous authorities which justify these rules are collected by Mr. Benjamin in his Treatise on Sales.
 
 *
 
 Applying them to the contract now under consideration, we think it cannot be. maintained that the parties intended the eon-
 
 *189
 
 tract should pass the ownership of the cotton at once to the buyer, without any ascertainment of the whole price by weighing, without its complete preparation for delivery, without any delivery, and without payment. This is not the case of an unconditional sale of a specific chattel for an ascertained price. Its subject was the crops of cotton thén lying in Wilkinson County. The contract was a cash contract. No credit was intended. An ascertainment of the pi'iee by weighing was contemplated, though it is not stated where the weighing should be done. The vendor undertook to deliver at Fort Adams. He was to deliver it in bales. Yet all the property was not in a deliverable state. Part was unginned, unbaled, and unbagged. The vendor was to prepare it for delivery by ginning, baling, and bagging it, and Lobdell was to furnish the necessary bagging, rope, and twine. This was to put the cotton into the condition in which he was bound to receive it, for he was not bound to receive any unless the whole was ginned, baled, and bagged. The contract was entire. And the vendor was not bound to put the cotton into a deliverable state unless Lobdell furnished the necessary materials. Besides, it was stipulated that the cotton should be received by Da Silva & Co.
 

 Our conclusion does not rest merely on the ground that the cotton was not weighed or delivered. It is unnecessary to decide that weighing the cotton was in this case a prerequisite to the transmission of the property, though that appears to be the law in England, when by the contract the goods are to be weighed by the vendor, or by him concurrently with the vendee. In the leading case of
 
 Hanson
 
 v. Meyer,
 
 *
 
 where it appeared that under a contract of sale a vendee agreed to purchase all the starch of the vendor, then lying at the warehouse of a third person, at so much per hundred weight, by bill at two months, and the starch was in papers, but the exact weight was not then ascertained, and was to be ascertained afterwards, and fourteen days
 
 *190
 
 were to be allowed for tbe delivery, and where the vendor gave a note to the vendee, addressed to the warehouse-keeper, directing him to weigh and deliver to the vendee all his starch, it'was decided that the absolute property in the starch did not pass to the vendee before the weighing, which was to precede the delivery aud to ascertain the price. And this, though a part had been weighed and delivered, and though a credit was given. Nothing was wanting to specify the subject of the contract. It was all the vendor’s starch in the warehouse. So in
 
 Simmons
 
 v.
 
 Swift
 

 *
 

 where the contract was, “ I have this day, October 23d, sold the bark stacked at Redbrook, at
 
 £9 5s.
 
 per ton of twenty-one hundred weight, to Hezekiah Swift, which he agrees to take and pay for on the 30th of November,” and some of the bark was weighed and delivered, it was held that the property in the residue did not vest in the purchaser until it had been weighed. In
 
 Logan
 
 v.
 
 Le Mesurier,
 

 †
 

 the sale was by the following contract: “ Hart, Logan & Co., of Montreal, sell, and Le Mesurier, Routh
 
 &
 
 Co., of the same place, buy a quantity of red-pine, timber, the property of Thomas Durell, of Hull, L. C., but under the control of the sellers, now lying above the rapids, near' the Chaudiere Falls, Ottowa River, and stated by the said Thomas Durell to consist of 1391 pieces, measuring 50,000 feet, more or less, deliverable at Quebec on or before the 15th of June next, and payable by the purchasers’ promissory notes, at ninety days from this date, at the rate of
 
 9\d.
 
 per foot, measured off. Should the quantity turn out more than above stated, the surplus to be paid for by the purchaser at
 
 9id.
 
 per foot on delivery, and should it fall short, the difference to be refunded by the sellers.” It. was held that by the terms of the contract the sale was not complete until the measurement and delivery of the timber was made, and that the transfer of the property was postponed until the measurement at the delivery. Here the timber was fully specified by the description, and by the place where it lay. A statement of the estimated
 
 *191
 
 quantity was given ; the time and place of delivery was designated, as was the price per foot, measured off. Credit was also stipulated for. It was the case of selling ascertained chattels for an ascertainable sum. If this stood alone the contract would have passed the property, but it was controlled by the provisions for the possession, carriage, and delivery, as well as the measurement and readjustment of the price. Many other English cases to the same effect might be cited.
 
 *
 
 'We do not understand that there is any disposition to depart from the doctrine of these cases, or that of Mr. Blackburn’s first and second rules. Of course, when nothing remains for the seller to do, when the weighing or measurement stipulated for is incumbent upon the buyer, or when the parties have provisionally agreed that a certain sum- shall be taken for the price, subject to future correction, the contract is not within the rules.
 
 Turley
 
 v. Bates
 
 †
 
 has sometimes been thought a departure from the earlier cases, but we think without reason. It was the case of the sale of an entire heap of fire-clay at two shillings per ton. The buyer was to cart it away and weigh it. He weighed, removed, and paid for a part, and refused the rest. It was held the property of the whole heap had passed to him. But here the seller had nothing to do with the weighing or delivery. He had performed all he was required to do, either for ascertaining the quantity or the price. Besides, the jury had found as a fact that the sale was of the whole heap. The ease of
 
 Kershaw
 
 v.
 
 OgdLen
 

 ‡
 

 is in substance the same. In each of these cases the contract was in parol, and what it was, necessarily for a jury.
 

 It is true there are some American decisions, especially in New York, that are not in entire harmony with those we have cited. There are at least some dicta in
 
 Crofool
 
 v.
 
 Bennett,
 

 §
 

 tending to show that specification of the subject in a contract for sale is suflicieut to pass the property, though the vendor has the duty still of ascertaining the entire price
 
 *192
 
 by weighing or measuring before delivery. And in
 
 Kimberly
 
 v.
 
 Patchin,
 

 *
 

 and
 
 Russell
 
 v. Carrington,
 
 †
 
 it seems to have been ruled that the sale of a specified quantity of grain, part of a larger bulk, with a receipted bill of sale and an order for the grain, passed the title without any actual separation or delivery of the property. These decisions, we think, are not in accordance with the authorities generally in this country. They are in conflict with later decisions in New York. In
 
 Kein
 
 v.
 
 Tupper,
 

 ‡
 

 the English rule was strictly accepted. There, it was said by Chief Justice Church, that when anything remains to be done by the vendor to ascertain the identity, quantity, or quality of the property, no title passes. That was the case of a sale of a certain number of bales of cotton, described by marks, at so much per pound, and the court said, as the cotton was to be weighed by the vendors to ascertain the quantity, and sampled by both parties to ascertain the quality, no title passed until these acts were done. We do not care, however, to review the decisions on this subject farther, for the stipulation in the contract now under consideration, that the cotton should be paid for when weighed, was only one of several provisions tending to the conclusion that the intention of the parties was not to effect an immediate passing of the property.
 

 We have already noticed that no sale upon credit was intended. There was, therefore, no reason why the vendor should part with anything before the purchase-money was paid or tendered. The possession was certainly retained. The vendors undertook to deliver at Fort Adams. To enable them to carry, and thus deliver, possession was indispensable. The contract also provided that the cotton should be received by Da Silva & Co. This agreement to carry and deliver at Fort Adams on the Mississippi, where it was obviously intended the contract should be consummated by the receipt of the cotton and the payment of its price, concurs with other circumstances in indicating a purpose of the
 
 *193
 
 parties that the property was not intended to be changed until the weighing, delivery, receipt, and payment took place. So it was regarded in
 
 Logan
 
 v.
 
 Le Mesurier.
 

 *
 

 Indeed, assuming, as the contract warrants, that the sellers were to carry the cotton to a designated place, and to ascertain its quantity and aggregate price by weight before delivery, and assuming that it was then to be received, and that payment for the whole was to be concurrent with the delivery, it is hard to find any intention that the owners intended to part with their ownership while the cotton lay at Felter’s plantation.
 

 Added to this is, we think, a very significant circumstance. The contract shows that a portion of «the cotton was not in a condition for delivery. True, it was relatively but a small portion, sufficient, as found by the court, to make about twenty bales. But, as we have noticed, the contract was entire. It was for all the crops. The purchaser was under no obligation to take less than the whole. The subject of the contract was baled cotton, and Lobdell bargained for that. Nothing in the contract, indeed, shows clearly how much of the cotton was unginned, and how much was unbaled, but it reveals that a portion was, and certain it is it was considered essential that all which had not been ginned and baled and bagged, should be put into that condition before the vendee was required to accept it. And this the sellers were required to do. So much is clearly implied in the contract. If, then, it be, as asserted in Mr. Blackburn’s first rule, that when anything remains to be done by the seller for the purpose of putting the goods into that state in which the purchaser is bound to accept them, or, in other words, into a deliverable condition, the property does not pass, it cannot be held that there was any intention of Gordon, or his principals, to transmit to Lobdell the ownership of the cotton before its delivery and before the payment of its stipulated price. We do not deny that a person may buy chattels in an unfinished condition and acquire the right of
 
 *194
 
 property in them, though possession he retained by the vendor, in order that he may fit them for delivery. But in such a case the intention to pass the ownership by the contract cannot be left in doubt. The presumption is against such an intention.
 

 It should also be noticed that Lobdell undertook by the contract to furnish the necessary bagging, rope, and twine to put the unginned and unbaled cotton in a deliverable state. Obviously this was to be done before the sellers were bound to deliver. It was, therefore, a condition precedent upon which the vendee’s right depended. With this condition there was no compliance, and thus neither the vendors nor the vendee did all that it was contemplated and agreed they should do preparatory to the acceptance of the goods, or to bring the cotton to the condition in which it was understood it should be to entitle the sellers to the price stipulated.
 

 On the other side it has been argued with much earnestness, that the provision in the contract, the cotton from the date thereof should be at the risk of Lobdell, exhibits an intention of the parties that the property should pass. It must be admitted that when a contract of sale has transmitted the property in its subject to the buyer, the law determines, in the absence of agreement to the contrary, that the risk of loss belongs to him. This is a consequence of his ownership, though undoubtedly the property may be in one and the risk in another. But it needs no agreement that the buyer shall take the risk, if it is intended the ownership shall pass to him. Hence the stipulation that the cotton should be at the risk of Lobdell after the date of the contract, instead of showing an intention of the parties that the right of property should pass to him, seems rather to indicate a purpose that the ownership should remain unchanged. Else why introduce a provision totally unnecessary? Such was the inference drawn from the introduction of a similar clause in a contract considered in
 
 Mnrtineau
 
 v.
 
 Kitching.
 

 *
 

 There it was stipulated that the goods should
 
 *195
 
 remain at the risk of the sellers, and Lord Cockburn asked “ if the property in the goods had not passed to the buyers why it was said the goods should remain at the risk of the sellers?” adding further, “what would be the necessity, what would be the object and purpose of such a stipulation if the property still remained in them? Of course it would be at their risk.” It may be asked w hat then was the object of stipulating that the cotton should be at Lobdell’s risk if it was not intended to evidence a transmission of the title? No doubt some purpose existed, and we think it may be found in the circumstances in which the parties stood when they contracted. The cotton was in a disturbed region of the country. It was in danger of destruction by-the Confederate forces, and of capture by the United States forces. The sellers undertook to carry and deliver it at the landing at Eort Adams.. Such a delivery might be rendered impossible by the vicissitudes of the war, and hence it was a reasonable provision that Lobdell should bear the risk, that the sellers should not be answerable in damages in ease of Confederate burning or Federal capture. To us this is a sufficient explanation of the assumption of the risk by Lobdell, without regarding it as a mutual recognition of a change of ownership.
 

 It is hardly necessary to add that the receipt of $30 “ in order to confirm the contract,” can have no bearing upon the question whether the property passed. The confirmation of the contract and its effect are distinct matters. Whatever may have been thought by some old writers respecting the effect in the transmission of property, of giving and receiving earnest-money, it is now considered of no importance, or of the smallest importance. The subject is discussed in Benjamin on Sales,* and the conclusion is reached that the true legal effect of earnest is simply to afford conclusive evidence that a bargain has been actually completed, with mutual intention that it should be binding on both; and that the iuquiry whether the property has passed in
 
 *196
 
 such cases is to be tested not by the fact that earnest is given, but by the true nature of the contract concluded by giving the earnest. The author says further, “No case has been found in the books in which the giving of earnest has been held to pass the property in the subject-matter of the sale, where the completed bargain, if proved in writing, or in any other sufficient manner, would not equally have altered the property.”
 

 In our judgment, therefore, the contract of July 31st, 1863, must be regarded as only an agreement to sell, and not as effecting a transfer of the ownership. It left the property in Elgee, where it was before.
 

 We are the better satisfied with this conclusion because it works substantial justice, and because it accords with what appears to have been the subsequent understanding of the parties. The bargain was for cash, yet no steps were taken to consummate it until after the cotton was seized in April, 1864. Never indeed. No tender of the price was made, the cotton was neither weighed, delivered, nor received, and, throughout, both parties appear to have treated the agreement as merely executory.
 

 The result of what we have said is that neither Lobdell, nor Woodruff & Co., who claim under him, had any such ownership of the cotton as to entitle them or either of them to sue in the Court of Claims for its proceeds.
 

 We come next to the claim of Mrs. Nutt, executrix of Haller Nutt, deceased. A very vigorous argument has been made to us in support of this claim, but we think it cannot be sustained. Assuming that Nutt’s contract with Elgee, made in October, 1863, was not illegal, that it was not in violation of the non-intercourse laws, it still was not such a contract as passed the property in the cotton. The finding of the court is, that in October, 1863, Truman Holmes, as the agent of Dr. Nutt, contracted with Elgee .for the sale from him of so much of the 2100 bales of cotton stowed at Felter’s plantation as he (Holmes) should get out in safety to a market, for the price of £15 per bale, to be paid in Liver
 
 *197
 
 pool. The risk of the cotton till got out to be on Mr. Elgee. That this was but an executory contract is very plain. Its subject was indefinite. It was not necessarily the 2100 bales; not certainly any of them. It was simply so much of them as Holmes should get out in safety to a market The agreement contemplated that he might never get out any. If so nothing was agreed to be sold. In fact he never did get out a bale. Whatever else may be dispensed with, it is certain that there can be no sale of personal chattels without a specific identification of the thing sold. Which of the whole number of bales could the purchaser say was his? Eor which of them could he have been compelled to pay? And there is no evidence that Holmes ever received the cotton or any part of it, or asserted any possession, though the sale was on credit, and if the property was his principal’s he was entitled to remove it at once to a market.
 

 Our attention has been called to the letter dated Oetobei 8th, 1868, and addressed by Elgee to Holmes afterwards, which it is argued was itself a sale.
 
 *
 
 This letter was not found by the court to have been the contract between the parties. It refers to the former agreement, and evidently it was intended as a direction where to pay the price of the cotton, if any should be got out, and if any purchase-money should become due. It had no other purpose. It was not even a delivery order. Much less can it be regarded as a bill of sale. And there is no finding that it was accepted. The only eoutract, therefore, respecting the sale of the cotton to Holmes upon which the executrix of Dr. Nutt can rely, is that found by the court to have been made; a contract for the sale of so much of the 2100 bales as Holmes should get out in safety to a market, and that contract passed no property in the cotton.
 

 This disposes of the whole case. The property in the cotton was in Elgee* and neither of the contracts proved divested him of his ownership. The result is that his per
 
 *198
 
 sonal representatives are entitled to a judgment for the entire proceeds of the cotton held in trust for the owner.
 

 Judgment reversed, and the record is remitted with instructions to dismiss the petitions of Woodruff & Co., and Mrs. Nutt, executrix, and to enter a judgment in favor of the personal representatives of Elgee, for the sum found in the treasury, the net proceeds of the sale of cotton.
 

 Dissenting, Justices BRADLEY and HUNT.
 

 *
 

 See it set out,
 
 supra,
 
 foot of p. 181 and top of p. 182.—Rep.
 

 *
 

 Pages 151, 152.
 

 †
 

 Second edition, p. 236.
 

 *
 

 Same edition, p. 234, et seq.
 

 *
 

 6 East, 614.
 

 *
 

 5 Barnewall & Cresswell, 857.
 

 †
 

 6 Moore’s Privy Council, 116.
 

 *
 

 See Zagury
 
 v.
 
 Furnell, 2 Campbell, 240; Rugg
 
 v.
 
 Minett, 11 East, 210; Gilmour
 
 v.
 
 Supple, 11 Moore’s Privy Council,
 
 551.
 

 †
 

 2 Hurlstone & Coltman, 200.
 

 ‡
 

 3 Id. 717.
 

 §
 

 2 Comstock, 258.
 

 *
 

 19 New York, 330.
 

 †
 

 42 Id. 118.
 

 ‡
 

 52 Id. 553.
 

 *
 

 Supra.
 

 *
 

 Second edition, pages 260-2.
 

 *
 

 See the letter,
 
 supra,
 
 p. 183. — Bep.