JOHN STEWART, *Appellee,* v. THE HENNINGSEN PRODUCE COMPANY, *Appellant.*

No. 17,897.

SYLLABUS BY THE COURT.

1. SALE—*Contract—Rule of Construction—When Property Vests in Buyer.* The *prima facie* rule of construction of a contract for the sale of goods not in existence but to be produced by the seller is, that the parties intended that the property vested in the buyer and the right to the price in the seller as soon as the contract came to relate to specific ascertained goods; and the inquiry in such a case must always be whether there is any sufficient indication of a contrary intention.

2. ———— *Same.* Where the goods contracted for are an entire quantity and there is nothing in the circumstances of the case to indicate a contrary intention, the risk of loss attaches to the quantity of goods only when completed and ready for delivery, and not to each separate installment as completed and ready for delivery.

3. ———— *Same.* Plaintiff agreed to sell and defendant to take at specified prices 10,000 pounds each of "whites" and "yolks" of eggs; the product known as "egg-meats" was to be put up by plaintiff in fifty-pound cans from number one "candled" eggs, the cans as filled to be placed in cold storage and delivered "f. o. b." plaintiff's station as ordered out by defendant. The contract was entered into in April and the plaintiff was to pay all charges up to January first for "storage, insurance and interest." The quantity bargained for was not completed and stored until October 12. The whites were all shipped on

Stewart v. Produce Co.

defendant's order, received in good condition and paid for. The yolks were ordered out in the following March and were found to be rotton and unfit for consumption. In an action for the price of the yolks it is held, that the contract was entire and indivisible; that the property passed October 12, when nothing remained to be done by plaintiff to put the goods in a deliverable state, and that any loss occurring after that time was the defendant's.

4. ——— *Stipulation that One Party Shall Insure.* While a provision that either party shall insure the goods contracted for is some evidence that the risk of loss was assumed by him, it is not controlling either in the determination of that question nor the question when the title to the property passes. In this case it is held that the stipulation that the seller should pay the cost of insurance up to January 1, although made at the buyer's instance, was intended to be for the benefit of the latter only from the time the property passed and he acquired an insurable interest and that the stipulation does not indicate that until January 1 the seller should retain the title.

5. EVIDENCE—*Witness—Expert—Manager of Cold Storage Plant.* A person who has had nine years' experience as manager of a cold storage plant and who has had occasion to observe the condition of frozen products kept in storage is qualified to state his opinion whether a product such as egg-meats having been once solidly frozen will thaw in a temperature lower than the freezing point.

6. FINDINGS OF JURY—*Evasive and Equivocal.* Where the jury return evasive and equivocal answers to special questions the court should on motion of the party submitting the questions require the jury to make such answers definite and unequivocal.

Appeal from Cloud district court. Opinion filed January 11, 1913. Reversed.

*Park B. Pulsifer,* and *Charles L. Hunt,* both of Concordia, for the appellant.

*F. W. Sturges,* of Concordia, *T. F. Garver,* and *R. D. Garver,* both of Topeka, for the appellee.

STATEMENT.

Plaintiff and defendant entered into a contract through letters and telegrams, whereby defendant .agreed to purchase from plaintiff 10,000 pounds each of whites and yolks of eggs. Pursuant to this con- tract plaintiff put up 10,995 pounds of whites and 9576 pounds of yolks. All of the whites were shipped to defendant and paid for. Fifty cans of the yolks were also shipped, but defendant refused to pay for them, or for those remaining on hand, claiming they were rotten and unfit for use. This action was brought to recover the contract price of the yolks. The jury returned a verdict for plaintiff. From the judgment the defendant appeals.

The contract was made in April, 1909. The plain- tiff commenced the separating, canning and storing of the eggs in May, and continued until October 12, 1909, at which time he had put up the quantities above mentioned. The product thus manufactured is known to the trade as "egg-meats." It is prepared by sep- arating, by hand, the whites from the yolks of eggs, placing the whites in one can and the yolks in another, and freezing the contents. After each day's work in separating, the egg-meats were taken in cans to the plant of the Concordia Ice & Cold Storage Company.

The first shipment was made by plaintiff on October 2, 1909, upon request of the defendant, to the Schal- linger Produce Company at Spokane, Wash., and con- sisted of sixty cans of whites. This shipment reached its destination in good condition, and the contents of the cans were fresh and marketable. The second ship- ment was made to the same concern on November 17, 1909, and consisted of sixty cans, all intended to be whites. One of the cans, however, proved to be one containing yolks, and the contents of that can were rotten and unfit for use. The whites were in good condition. The third shipment consisted of 102 cans,

supposedly whites, but among which ·was found one can of yolks. The whites were in good condition, but the can of yolks was rotten.. These shipments disposed ·of all the whites.

Early in March, 1910, at the request of defendant, three cans of the yolks were shipped to a commission firm in Chicago. One can proved to be in fair condition and two were rotten. On March 16, 1910, fifty cans of yolks were shipped to the Schallinger Produce Company, at Spokane. Forty-six of these cans, being rotton and putrid, were condemned by the State Dairy Food Department, and by order of court were hauled to a crematory and destroyed. The remainder of the yolks were not shipped, and were in the possession of the cold storage company at Concordia when this action was tried in April, 1911. All of the shipments reached their destination in a solidly frozen condition.

Plaintiff drew upon defendant for the price of each shipment when it went forward. On March 1, 1910, for the first time, he invoiced the remaining yolks on hand to defendant, and rendered a statement of the balance claimed to be due. He paid the storage charges to January 1, 1910, and paid the insurance premiums, the insurance being carried in his name.

The opinion of the court was delivered by

PORTER, J.: The letters and telegrams comprising the contract show a proposal by the plaintiff to "contract any quantity you (defendant) may need. All this·stock to be put up out of number one candled eggs." The acceptance was shown by a letter and telegram to the effect that the defendant would take 10,000 pounds of each product at the prices named, "f. o. b., your station, all charges paid up to January 1st, namely, storage, insurance and interest." Plaintiff was to place the product in cold storage with the Concordia Ice & Cold Storage Company, and as defendant ordered shipments made plaintiff was to load

the same on board cars free of charge at that station.

The answer alleged that the product was to be and remain the property of plaintiff until January 1, 1910, unless sooner taken out of cold storage and settled for by the defendant; and further alleged that the product was not put up from number one candled eggs and was not in first-class condition when put into storage, but that the same was rotten and of no value.

In substance the findings are that the product spoiled while in the cold storage plant; that in each instance when loaded into cars at Concordia it was in a frozen condition; that it was placed in cars properly iced, and that it arrived at destination in a frozen condition. There is a finding that while in cold storage the egg-meats spoiled and became rotten by the variation of the temperature of the room where they were kept and that the temperature at some time exceeded 15 degrees above zero.

The principal contention is that under the contract the title to the product did not pass to defendant until January 1, 1910, or at least until October 12, when the stipulated amount had been prepared and stored by plaintiff. The trial court instructed that any loss that occurred after delivery to the cold storage company was the defendant's loss. The court gave the proper construction to the terms of the contract if the title to each can of the product passed to defendant at the moment it was delivered at the cold storage plant. On the other hand, if as contended, the title to none of the product passed until January 1, or if the title to no portion of it passed until the whole amount contracted for had been produced and stored, the court erred in the interpretation of its terms.

The whole controversy turns upon the intention of the parties. That always controls. (*Bailey v. Long,* 24 Kan. 90; *Shepard v. Lynch,* 26 Kan. 377, 382; *Howell v. Pugh,* 27 Kan. 702; *Kingman v. Holmquist,* 36 Kan. 735, 14 Pac. 168, 59 Am. St. Rep. 604; *Barber*

*v. Thomas,* 66 Kan. 463, 71 Pac. 845; *Clarkson v. Stevens,* 106 U S. 505, 27 L. Ed. 139; 35 Cyc. 300.) When the intent must be arrived at from conflicting evidence it is a question for the jury. When it turns upon the construction of a writing it is a question of law for the court. (*Caywood & Co. v. Timmons,* 31 Kan. 394, 2 Pac. 566; *Bailey v. Long,* supra.) Here the intent of the parties was for the court to determine from the correspondence comprising the contract viewed in the circumstances and situation of the parties. The universal rule is that "A contract for the sale of an article not in existence but to be manufactured is an executory contract, under which no property in the article will pass during the progress of the work nor until the article is completed and ready for delivery, unless a contrary intention clearly appears." (35 Cyc. 299.) And it is a general rule in sales of goods that the title passes to the buyer when the selection, separation and appropriation is complete and nothing remains to be done to complete the contract. Separation and appropriation are not always necessary. (*Kingman v. Holmquist,* supra.) It is competent for the parties to agree that the property in the goods shall pass to the vendee notwithstanding something remains for the vendor to perform before actual delivery. In *Bailey v. Long,* 24 Kan. 90, the contract was for the sale of a certain number of bushels of corn to be gathered out of the field, and it was held that title remained in the vendor until the corn was gathered. But in the opinion the court recognized the rule that the intent controls and that the parties might have contracted for a passing of the title at once, notwithstanding there remained certain things to be done by the vendor.

The question in the present case is not free from difficulty. The intention of the parties must be gathered from the language of the contract viewed in the light thrown upon it by the situation of the parties

and the circumstances shown by the evidence. The supreme court of the United States in *The Elgee Cotton Cases*, 89 U. S. 180, reviewed the English cases and approved Lord Blackburn's two rules (Blackburn on Sales, 2d ed., § 235, Canadian ed., p. 184) and the third rule laid down by Benjamin (restated in Benjamin on Sales, 5th ed., p. 318). These rules, which have been substantially adopted by the English Sales Act (§ 18), are as follows:

*"First.* 'When, by the agreement, the vendor is to do anything to the goods for the purpose of putting them into that state in which the purchaser is bound to accept them, or, as it is sometimes worded, into a deliverable state, the performance of those things shall, in the absence of circumstances indicating a contrary intention, be taken to be a condition precedent to the vesting of the property.'

*"Second.* 'Where anything remains to be done to the goods for the purpose of ascertaining the price, as by weighing, measuring, or testing the goods, where the price is to depend on the quantity or quality of the goods, the performance of these things shall also be a condition precedent to the transfer of the property, although the individual goods be ascertained and they are in the state in which they ought to be accepted.'

*"Third.* 'Where the buyer is by the contract bound to do anything as a consideration, either precedent or concurrent, on which the passing of the property depends, the property will not pass until the condition be fulfilled, even though the goods may have been actually delivered into the possession of the buyer.'" (p. 188.)

The supreme court of the United States applied these rules to a contract for a sale of certain crops of cotton "numbering about 2100 bales" to be delivered at a certain landing, and to be paid for when weighed, the buyer to furnish bagging, rope and twine necessary to bale the cotton unginned, the cotton to be from the date of the contract "at the risk" of the buyer. At the time of the making of the contract the cotton baled was stored under cover. About twenty bales

(not baled) were in a gin house ten miles from the landing. The buyer at once employed and paid a person to watch and care for the cotton, who performed his duties until the cotton was seized by the United States authorities. Notwithstanding the provision that the cotton should be at the buyer's risk from the time the contract was entered into, the court held that the contract was executory only and that no title passed to the buyer. In the opinion the court referred to the fact that some of the American courts have refused to follow the English courts in respect of the requirements of the second rule *supra,* and hold that specification of the goods is sufficient to pass the property, though the obligation still rests upon the seller to ascertain the exact price by weighing before delivery, citing *Kimberly v. Patchin,* 19 N. Y. 330, and *Russell v. Carrington,* 42 N. Y. 118, where sales of specific grain consisting of part of a larger bulk were held to pass the title without actual separation or delivery. And this court, in *Howell v. Pugh,* 27 Kan. 702, held that a sale of a crop of wheat in stacks undivided, and of other crops growing in the field undivided, passed the title to the buyer where such was the intention of the parties. Again, in *Kingman v. Holmquist,* 36 Kan. 735, 14 Pac. 168, 59 Am. St. Rep. 604, the contract was for the sale of twenty-five thousand hedge plants tied up in bundles each containing 250 plants. The sale was out of an ascertained lot of 82,000. It was held that a selection and a separation were unnecessary, and that the property passed to the buyer. In the opinion, referring to the rule laid down by Benjamin in his treatise on Sales, it was said that "the weight of recent American authority sustains the proposition that when property is sold, to be taken out of a specific mass of uniform quality, the title will pass at once upon the making of the contract, if that appears to be the intention of the parties." (p. 739.) The case is cited by the editor of the American & English Encyclopedia of

Law, with others from New York, New Jersey, Minnesota, Iowa and Florida, holding that where the sale is of a certain quantity of goods which constitutes a portion of a designated and uniform mass the title will pass without a separation or appropriation; but the editor declares that "this view is supported neither by principle nor the weight of authority." (24 A. & E. Encycl. of L. 1055.) In the opinion in *The Elgee Cotton Cases,* 89 U. S. 180, the court declined to rest the decision merely on the ground that the cotton was not weighed or delivered, and expressly held that it was unnecessary to decide that question. The ground of the decision that no title to the cotton passed to the buyer was that when the loss occurred all the property contracted for was not in a deliverable state. In the opinion it was said that the buyer "was not bound to receive any unless the whole was ginned, baled and bagged. The contract was entire." (p. 189.)

The defendant urges that the stipulation for insurance of the egg-meats by the plaintiff at the latter's expense warrants the inference that until January 1 the title to the goods was in the seller. The inference to be drawn from the assumption by one of the parties of the risk of loss before delivery of the goods has frequently been considered by the courts. In *Martineau v. Kitching,* L. R. 7 Q. B. 436, the contract provided that the goods were to be "at the seller's risk for two months." The goods had been paid for in advance of being weighed, the amount to be adjusted and settled when the goods came to be weighed on delivery, and the purchaser had taken part of them. The residue was destroyed by fire after the lapse of two months and before being weighed. Cockburn, C. J., held that the property passed to the buyer because the goods were specific and the intention clearly was that the property should not depend upon the weighing. The fact that the contract expressly provided that the goods should

34—88 KAN.

be at the seller's risk for two months was held to raise the presumption that the property should be in the buyer, as otherwise such a provision would be unnecessary. Commenting upon that case the editor of Benjamin on Sales, 5th ed., uses this language:

"It is a fair inference from the judgment of Cockburn, C. J., that where the risk is assumed by a party who is at the time of the contract the owner of the goods, as a seller who has agreed to sell, this fact is evidence that it is not intended that he shall remain owner; that the property is intended to pass. Otherwise such a provision would be unnecessary as the risk *prima facie* attaches to the ownership." (p. 404.)

And in *The Elgee Cotton Cases,* supra, the United States supreme court expressly approved the reasoning of Cockburn, C. J., in *Martineau v. Kitching,* supra, and, as we have seen, applied it to the case of a buyer who assumed all risk; and from this fact the court drew the inference that it was the intention that the property should not pass to him. In the opinion it was said:

"It must be admitted that when a contract of sale has transmitted the property in its subject to the buyer, the law determines, in the absence of agreement to the contrary, that the risk of loss belongs to him. This is a consequence of his ownership, though undoubtedly the property may be in one and the risk in another. But it needs no agreement that the buyer shall take the risk, if it is intended the ownership shall pass to him. Hence the stipulation that the cotton should be at the risk of Lobdell after the date of the contract, instead of showing an intention of the parties that the rights of property should pass to him, seems rather to indicate a purpose that the ownership should remain unchanged. Else why introduce a provision totally unnecessary?" (89 U. S. 194.)

With respect of insurance there seems to be much diversity of opinion, although it is difficult to discover any ground for a different inference than would arise from an assumption of the risk of loss. It is said in

Benjamin on Sales, 5th ed., that "The fact that one party or the other is to insure the goods is material to the determination of the question on whom the risk is to fall." (p. 404.)

The leading English case is *Anderson v. Morice*, 1 App. Cas. 713, 44 L. J. C. P. 341, L. R. 10 C. P. 609. Much of the reasoning is applicable here, because the effect of insurance was considered and the contract was for the sale of an undivided quantity of goods. The plaintiff sued to recover the value of a cargo of rice which he had bought and insured with the defendant. The memorandum was: "Bought the cargo of Rangoon rice per Sunbeam, at 9 s. 1½ d. per cwt. cost and freight. Payment by seller's draft on purchaser at six months' sight, with documents attached." The Sunbeam had taken on board 8878 bags of rice, the remaining 400 bags which would have completed the cargo being on lighters alongside, when she sank and the portion of the cargo on board was lost. A fair illustration of the difficulty which courts experience in determining the ownership of goods sold under contracts similar to the one in the case at bar is shown by the diversity of opinion which arose over the facts in the cited case. The House of Lords was evenly divided and the decision in the Exchequer Chamber was affirmed, and it was held, reversing the unanimous opinion of the Common Pleas: (1) That as plaintiff had contracted to buy a complete cargo, the property did not pass till the cargo was completed so that shipping documents could be made out, this being one of the things to be done by the seller to put the goods in a deliverable state; (2) that apart from the question of the title to the property, plaintiff had no insurable interest in the part loaded, because he had only assumed the risk of that which he had contracted to buy, which was the complete cargo. The reasoning of Blackburn, J., in the judgment of the majority in the

Exchequer Chamber, is authority against the holding of the trial court in the present case that the property in each can of product passed to the buyer at the time it was placed in the cold storage plant. Having stated that it was conceded that if the rice on board the lighter had been lost before it was put on board the Sunbeam the buyer would have sustained no loss, and that it was at least the plain intention of the parties that the buyer would have been bound to pay for the cargo even though it was lost by reason of subsequent disaster either in port or on the way home, provided the lading was complete and the shipping document either prepared or if matters were in a situation where they could be prepared, the opinion proceeds:

"But there remains the disputed question whether each separate bag was at the risk of Anderson from the time it was put on board the Sunbeam, or whether it remained at the risk of the sellers until the whole intended loading was complete, and the shipping documents were ready, or at least everything was done to enable them to make out the shipping documents. This we think depends entirely on the intention of the parties to the contract, as appearing from it. There is nothing to prevent the parties from agreeing that, as the goods are shipped bag by bag, each bag shall be at the risk of Anderson, though the payment is postponed till the whole is on board; and if they have sufficiently expressed such an intention, then *Castle v. Playford* [L. R. 5 Ex. 165, L. R. 7 Ex. 99] is an express authority in this court that Anderson must bear the loss, though it occurred before the stipulated time for payment had arrived. In that case the words of the contract were express. On the other hand, *Appleby v. Myers* [L. R. 2 C. P. 651] is an express authority that if from the contract it appears that the intention of the parties is that the payment is to be only on the completion, nothing can be recovered, though that completion is prevented by an accident for which neither party is to blame. Both decisions are binding on us, even if we disapproved of them, but we agree with both." (44 L. J. C. P. 347, 348; s. c., L. R. 10 C. P. 609, 617.)

Because of the rule that when anything remains to be done by the seller to put the goods into a deliverable state the property does not pass, it was held to be the intention that the risk should become the risk of the buyer when and not till the whole lading was complete, and that there was nothing in the contract to rebut this *prima facie* rule of construction or to show a different intention. It should be observed that the question the court had before it was not, strictly speaking, in whom did the property vest, but upon whom was the risk. However, the reasoning upon which the judgment was placed is precisely the same.

On principle and on what we regard as the weight of authority, we think that the property in the egg-meats passed when the plaintiff had completed the entire amount of product contracted for and had placed the same in the cold storage plant. Until then he had not done the things that the contract required of him to put the goods into a deliverable state; and the defendant was not liable for its price and had no property in any part of it that might be in storage, except a contingent interest, provided all was completed as contracted for in amount and quality. Otherwise, if the property to each can of product passed to the buyer at the time it was placed in storage, the buyer would be bound to accept and pay for one can, or ten cans, or any number stored, notwithstanding the failure to furnish the residue. The contract, as in *The Elgee Cotton Cases,* supra, was entire. It seems to be conceded that October 12, 1908, was the time when the entire amount, or substantially the amount named in the contract, was completed and stored. It is true that one shipment was ordered out on October 2, and was received and paid for by the defendant. The property in this shipment, of course, passed when the plaintiff delivered it to the common carrier; but the property in the residue must be held to have passed on October

12, when nothing remained to be done by the seller except to place on board cars as ordered.

A recent case in point upon the entirety of the contract is *Walti v. Gaba,* 160 Cal. 324, 116 Pac. 963. There the agreement was for the sale of clipped and unclipped wool, the spring wool of 1906 at eighteen cents per pound, the fall wool of 1905 at fourteen cents. The fall wool being stored, it was to be delivered at a railway station with the spring wool when that was clipped. A deposit of $250 was made on the sale. The stored wool was destroyed by fire before the spring wool was clipped from the backs of the sheep. The question was which party sustained the loss. The court held the contract to be entire and that no title to any part of the wool passed.

For additional authorities holding that a contract of this nature is entire and indivisible, that each party has the right to insist upon full performance, and that the contract remains executory until the quantity or amount bargained for has been ascertained and is in condition for delivery, unless the contract shows a contrary intent, see *Pope et al. v. Porter et al.,* 102 N. Y. 366, 7 N. E. 304; *Thompson v. Conover,* 30 N. J. Law, 329; *Blackwood v. Cutting Packing Co.,* 76 Cal. 212, 18 Pac. 248, 9 Am. St. Rep. 199; *Johnson v. Hibbard,* 29 Ore. 184, 44 Pac. 287, 54 Am. St. Rep. 787; *Sempel v. Lumber Co.,* 142 Iowa, 586, 121 N. W. 23; *Hendricks v. Mocksville Furniture Co.,* 156 N. C. 569, 72 S. E. 592; *Gibbons v. Robinson,* 63 Mich. 146, 29 N. W. 533; *Slade v. Lee,* 94 Mich. 127, 53 N. W. 929; *Haynes v. Quay,* 134 Mich. 229, 95 N. W. 1082; 1 Mechem on Sales, §§ 753, 757; 17 Dec. Dig., Sales, §§ 200, 201; 35 Cyc. 299; 24 A. & E. Encycl. of L. 1063.

The contract in this case was for the sale of something not in existence but which the seller was to manufacture, and we find nothing in the terms of the contract nor in the circumstances or situation of the

parties to indicate an intention contrary to that which is presumed from the general rule governing the sale of an article or quantity of articles to be manufactured or produced, which is that the property will not pass during the progress of the work or until the specified amount of the product contracted for has been produced and is in a condition where it can be delivered according to the contract. The parties are at liberty to contract with a different intent.

"We do not deny that a person may buy chattels in an unfinished condition and acquire the right of property in them, though possession be retained by the vendor, in order that he may fit them for delivery. But in such a case the intention to pass the ownership by the contract can not be left in doubt. The presumption is against such an intention." (Strong, J., in *The Elgee Cotton Cases*, 89 U. S. 180, 193.)

The contention that no property in the goods passed until January 1, 1909, or what amounts in this case to the same thing, that the risk of loss by deterioration prior to that time was intended to be assumed by the plaintiff, can not be sustained. The *prima facie* rule of construction is that the parties intended that the property in the egg-meats vested in the buyer and the right of the price in the seller, in the language of Blackburn, J., in *Calcutta Company v. De Mattos*, 32 L. J. Q. B. 322, "as soon as it (the contract) came to relate to specific ascertained goods"; that is, on the completion of the quantity of product contracted for and its storage in a deliverable state subject to the orders of the buyer; and the inquiry in such a case always "must be whether there is any sufficient indication of a contrary intention." We approve the principles stated in Benjamin on Sales, 5th ed., that:

"1.  A provision that either party shall insure the goods contracted for is strong evidence that the risk of loss was intended to be assumed by him.

"2.  When the goods contracted for are an entire quantity, it is a question depending upon the terms

of the contract and the circumstances of the case whether the insurance covers, and the risk accordingly attaches to, the quantity of goods when completed only, or also each separate installment when delivered." (p. 409.)

The language of the provision upon which defendant bases the contention is "f. o. b. your station, all charges paid up to January 1st, namely storage, insurance and interest." This provision was inserted at defendant's suggestion. If, as contended, the property remained in the plaintiff until January 1, what reason was there for the stipulation? The defendant would have no insurable interest until the property passed. The evidence shows that the parties expected the entire product to be put up in the spring and early summer of 1909, and doubtless some of it in the ordinary course of dealing would have remained in storage until the first of January following. The defendant, however, had the right to order out a part or all at any time after the quantity contracted for was ready for delivery, but was not to be chargeable with interest on the price or for cost of storage or insurance until January 1. After the specified quantity had been produced and stored the insurance would be for defendant's benefit because the property then passed, and in the ordinary course of business the policy would then be transferred to defendant. Such is the construction which we think carries out the presumed intention of the parties; and, as stated, we are unable to find in the contract or the situation of the parties evidence sufficient to rebut the presumption. The jury should have been instructed that any loss occasioned prior to October 12 was the plaintiff's, whether it resulted from his fault or that of the cold storage company.

It is claimed that the court erred in refusing to permit an offer of proof to be made. Without deciding whether the defendant lost the right to a ruling upon this claim of error by failing to set out the testimony

by affidavit in support of the motion for a new trial, it is sufficient to say that the character of the testimony is indicated by the question to which objections were sustained which occasioned the offer of proof; and as another trial must be ordered the point will be considered. The only ground for the objections to the question was that the witness had not shown himself qualified to answer. The witness had been for nine years the manager of the cold storage plant where the egg-meats were stored, and testified to an experience in the business sufficient to qualify him to state his opinion whether a product like egg-meats after having been solidly frozen will thaw in a temperature below the freezing point.

To a number of special questions submitted at the request of defendant the jury gave evasive and equivocal answers. Asked to state whether 46 cans of frozen yolks were destroyed by order of court in Spokane, they answered, "There probably were some cans destroyed." Equally evasive answers were returned to no less than eight or nine other questions. Whether this resulted from a reluctance of the jury to find facts in favor of the defendant notwithstanding the evidence, we can not say. But the court should have sustained the motion to require the jury to return definite answers. Not infrequently cases arise where it becomes the duty of the court to set aside the verdict and grant a new trial because the answers are so evasive and unsatisfactory as to suggest that the defeated party has not had a fair and impartial trial. (*U. P. Rly. Co. v. Fray,* 31 Kan. 739, 3 Pac. 550; *St. L. & S. F. Rly. Co. v. Clark,* 48 Kan. 321, 29 Pac. 312; *S. K. Rly. Co. v. Michaels,* 49 Kan. 388, 396, 30 Pac. 408; *A. T. & S. F. Rld. Co. v. Wells,* 56 Kan. 222, 42 Pac. 699.)

The judgment is reversed and a new trial ordered.