### THE FRED E. HASLER.
### No. 450.

Circuit Court of Appeals, Second Circuit.

Aug. 1, 1933.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Chauncey I. Clark and Eugene Underwood, both of New York City, of counsel), for appellant.

Haight, Smith, Griffin & Deming, of New York City (Charles S. Haight and Wharton Poor, both of New York City, of counsel), for appellee.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

The libelant entered into a written contract with Hvalfangeraktiesclskapet Rosshavet, a Norwegian company which for convenience will be called Rosshavet, on May 5, 1928, to purchase the entire production of the whale oil factory ship Sir James Clark Ross for the season of 1928–29. The ship arrived at New York on April 15, 1929, and on the same day a provisional invoice, bill of lading and insurance policies were delivered to the libelant. It paid then 75 per cent. of the estimated purchase price of the whale oil on board the Ross.

The libelant chartered the tank barge Hasler of its owner, the Atlantic Oil Transit Corporation, to transport the oil from the Ross to its plant at Port Ivory, S. I. The Hasler, on the afternoon and evening of the same day, loaded part of the oil from the ship and with this oil aboard sank during the night because of her unseaworthy condition. The resulting loss and damage to the oil gave rise

to litigation which has previously been before this court. We held the Hasler and her owner liable for the loss. See 55 F.(2d) 919. Later we held that, because of the personal contract this libelant made with Atlantic Oil Transport Corporation, the liability of the latter could not be limited. See 65 F.(2d) 589. Now, on the appeal of the Atlantic Oil Transport Corporation from the interlocutory decree made on the report of a commissioner on a reference for the assessment of damages we are asked to decide whether this libelant had a cause of action against the Hasler and its owner when it brought this suit.

It is undisputed that the libelant made an agreement with Rosshavet and its underwriters on August 24, 1929, after the damage had occurred, which provided, inter alia, that neither Rosshavet nor its underwriters should have any claim against the libelant on account of the loss of the oil or the chartering of the Hasler; that this libelant would bring suit against the Hasler and her owners to recover the loss for the benefit, and at the expense, of Rosshavet and its underwriters; and Rosshavet and its underwriters agreed to execute any further documents thought advisable to release fully the libelant "and its subsidiaries, and the officers and employees of said company and its subsidiaries, from all such liability for said oil &/or the loss thereof." It also appeared that Rosshavet, on July 30, 1929, and before suit was brought, assigned all its claims and causes of action in the premises to the libelant. There was no proof that the libelant ever had paid Rosshavet the entire purchase price of the oil lost or damaged.

It is plain from an examination of the record that the object of the negotiations and agreements, after the loss occurred, between the libelant and Rosshavet and its underwriters, was primarily for the purpose of having the suit brought in the name of Proctor & Gamble who had made the contract with Atlantic Oil Transport Corporation for transporting the oil from the Ross to Port Ivory so that the benefit of whatever effect that contract might have in limitation proceedings might be had.

Though much has been made in argument about these subsequent negotiations and agreements, it appears self-evident that the liability, if any, of the Hasler and her owners, to this libelant for the loss of the oil has not been diminished by them. The libelant has assigned no rights or causes of action it had against the respondent, and, if any effect should be given in this suit to such subsequent happenings, it would be only by way of what added rights the libelant may have acquired by assignment from Rosshavet. As will appear, we find it unnecessary to go into that phase of the matter for we think that, under the contract with Rosshavet of May 5, 1928, the parties had performed to such a point that the libelant held title to the oil on the Hasler when it sank. If it owned that oil then, its right to maintain this action cannot, of course, be disputed.

That contract, so far as now material, provided in its printed portion that the oil should be "delivered on c. i. f. terms" and for tank oil to be pumped into the buyer's receiving tanks or cars placed alongside the ship; for the testing and weighing of the oil; and for payment of "75% of the approximate nett value of the cargo * * * against documents upon presentation in buyer's bank in New York after the ship is cleared at the custom house, the balance to be paid immediately the cargo has been weighed, failing which the buyers have to pay interest." The documents required to be presented were listed. As the payment of 75 per cent. against documents was made before the Hasler was loaded, that part of the contract is to be taken to have been performed before any loss occurred. Paragraph 13 as printed read: "The seller's responsibility for the cargo to cease successively with delivery over ship's side." This was crossed out and a new paragraph numbered 13 was written in as follows: "The sellers responsibility for the cargo to cease successively with delivery over ship's side, but if discharging takes place in New York, sellers risk not to cease until oil has been delivered at scales at buyers plant 'Port Ivory' S. I., N. Y. or at scales at other R. R. terminal within the district of the port of New York."

The provision for delivery of the oil "on c. i. f. terms" was so general that it throws little light on the passing of title. So far as this clause is concerned, it may or may not have passed before the Hasler sank. It does, however, assume considerable significance in connection with the fact that payment was actually made against documents to the extent of 75 per cent. of the estimated net value of the cargo and to the full extent called for before the cargo was weighed. The symbolical delivery of a cargo of goods by the delivery of such documents as were here delivered is well understood and recognized. When such delivery by a seller is followed, as here, by the receipt of the payment agreed to be made then by the buyer of the goods, the intention of the parties to have the title then

pass to the buyer is manifested, unless the contract negatives such an intention, and as a matter of law, title does then pass because the parties intended it should. Compare Commercial Bank of Keokuk v. Pfeiffer et al., 108 N. Y. 242, 15 N. E. 311; American Sugar Refining Co. v. Page & Shaw (C. C. A.) 16 F.(2d) 662; Matter of Wenger & Co. v. Propper S. H. Mills, 239 N. Y. 199, 146 N. E. 203; Kennedy, C. I. F. Contracts (2d Ed.) pp. 141, 142.

Moreover, the facts in this case go much farther in support of the conclusion that the parties to the contract intended to have title to the oil pass to Proctor & Gamble at a time previous to the sinking of the Hasler. The oil was actually pumped into the tank barge chartered by Proctor & Gamble and so delivered to the libelant. From that time the libelant, as between it and Rosshavet, had full possession and control of the oil. If the libelant had sold it, or taken it to whatever place it pleased other than the scales at its plant at Port Ivory, or the scales at some other railroad terminal within the district of the port of New York, it certainly could not have successfully defended an action on the contract for the purchase price on the ground that the oil had not been delivered to it. Nor have we overlooked the provision in paragraph 13 to the effect that, this being delivery in New York, the seller's risk had not ceased before the barge sank. Title to goods and risk of loss are not inseparable. As Prof. Williston says in Williston on Contracts, vol. 11, § 963: "Risk of loss or deterioration is a natural incident of ownership, but there is no rule of law which prevents one who is not the owner from agreeing to bear the risk. He thereby virtually becomes an insurer of goods he does not own. * * * It is perhaps more common for the buyer to assume the risk, although the property may not have passed to him, than it is for the seller to retain the risk though the property has passed from him, but it is obvious that the latter arrangement is possible."

In The Elgee Cotton Cases, 22 Wall. 180, 194, 22 L. Ed. 863, the agreement was that the cotton should be at the risk of the buyer from the date of the contract. In holding that title did not pass to the buyer, it was said in part that "It must be admitted that when a contract of sale has transmitted the property in its subject to the buyer, the law determines, in the absence of agreement to the contrary, that the risk of loss belongs to him. This is a consequence of his ownership, though undoubtedly the property may be in one and the risk in another. But it needs no agreement that the buyer shall take the risk, if it is intended the ownership shall pass to him." So the agreement was taken to indicate that title was not to pass to the buyer because, if it were, the provision that the buyer would take the risk would have been unnecessary. Here the converse is true and the same reasoning indicates that title did pass. For, if it did not when partial payment was made against the delivery of documents, or at least when delivery of the oil was made into the buyer's tank, why have the otherwise useless provision that the seller should retain the risk of loss until a later time? Without the passage of title, the risk would have been retained by the seller as a matter of law. Nor is the provision for final payment on "nett delivered weights" conclusive. That was the chosen method to adjust fairly the total amount to be paid for oil already provisionally invoiced, appropriated to the contract, and partly paid for. Compare Perkins v. Minford, 235 N. Y. 301, 139 N. E. 276; Delaware, etc., R. R. Co. v. United States, 231 U. S. 363, 34 S. Ct. 65, 58 L. Ed. 269. As so often is the case, some things here indicate that the parties did not intend to have title pass until the oil was delivered to the scales and others indicate that they did intend to and did put the title in the libelant before this loss occurred. We believe the latter overbalance the former, and accordingly hold that the libelant had title to the oil when it was pumped aboard the Hasler and was accordingly entitled to sue for the loss.

Although it has seemed best to consider the question of title on the merits, it may well be noticed that, in view of the fact that the libelant's right to sue was involved in our decision in The Fred E. Hasler, 55 F.(2d) 919, it is somewhat doubtful whether this issue is now open. However, as the District Court had jurisdiction of this cause for the assessment of damages, the decree would have to be affirmed anyway.

Decree affirmed.