No. 20,350.

SETH ELY, *Appellee*, v. THE WICHITA NATURAL GAS COMPANY, *Appellant*.

No. 20,351.

BELL BROTHERS & MCDONALD, *Appellee*, v. THE WICHITA NATURAL GAS COMPANY, *Appellant*.

SYLLABUS BY THE COURT.

1. CONTRACT—*Purchase of Gas from Producing Wells—Contract Executory—Title to Gas Passed upon Delivery.* A contract by which a pipe-line company agreed to accept a minimum of 5,000,000 cubic feet of gas from the owners of a number of gas leases and producing wells, paying each month at the rate of three and one-half cents per thousand, held to have been executory, the title to the gas passing only as delivery was made.

2. SAME—*Contract for Sale of Gas—"Merchantable" Gas Construed.* In a contract by which a company owning a pipe line for the distribution and sale of natural gas to cities and towns and factories agreed to accept and pay for a stated daily minimum of gas, a provision that the gas was to be "merchantable" is held to imply its conformity to an ordinary and reasonable standard of quality; and the fact that the gas tendered under such a contract contained only from 500 to 550 British thermal units per cubic foot, while the gas handled by the

company, which was obtained from other sources, contained about 1000, is held to compel the conclusion as a matter of law that it was not "merchantable" in the sense in which that term was employed in the contract.

Appeal from Neosho district court; JAMES W. FINLEY, judge. Opinion filed December 9, 1916. Reversed.

*John H. Brennan, Hayes McCoy, Otto C. Massey,* all of Bartlesville, Okla., *John J. Jones,* of Chanute, and *A. C. Malloy,* of Hutchinson, for the appellant.

*H. P. Farrelly,* and *T. R. Evans,* both of Chanute, for the appellees.

The opinion of the court was delivered by

MASON, J.: The Wichita Natural Gas Company is a corporation owning a pipe line extending from Cushing, Okla., on the south, to Hutchinson on the west and Iola on the east, through which it supplies a number of cities and towns and factories with natural gas. On May 24, 1913, it entered into a written contract with Bell Brothers & McDonald and Williams & O'Dell, by which on certain conditions it agreed to pay at the rate of three and one-half cents per thousand feet for dry and merchantable gas to be furnished to it by them, the minimum amount to be 5,000,000 cubic feet daily. The company paid for all the gas it used, but beginning with the month of November, 1914, it did not use the full amount of the prescribed minimum. On April 7, 1914, two actions were brought against the company upon the contract, one by Seth Ely, who, by assignment, had succeeded to the rights of Williams & O'Dell, and the other by Bell Brothers & McDonald, the purpose of which was to charge it with liability at the rate of $175 a day (that being the daily charge for 5,000,-000 feet, at three and one-half cents a thousand) less what it had paid, for the months of November and December, 1913, and January and February, 1914, the division between the plaintiffs not being in dispute. By supplemental petitions similar claims were made for each month up to and including January, 1915. The company defended upon the ground that its refusal to accept and pay for as much gas as the contract called for was justifiable because it was due to the

fact that the gas furnished was of low grade, unmerchantable, and unsuited to its purpose. The plaintiffs recovered judgments aggregating $54,600.74, and the defendant appeals.

1. The actions were brought on the theory, which the trial court sustained, that the contract referred to was an executed contract, that the title to the gas had passed to the defendant, and that the plaintiffs were therefore entitled to recover the agreed purchase price. The defendant maintains that the contract was executory, that the title to the gas passed only as it was delivered and accepted, and that even if its defense based on the quality of the gas is not established, its liability is limited to such damages as the plaintiffs have suffered by reason of its failure to perform its agreement to take and pay for a fixed amount of gas. This phase of the controversy must be determined largely from the language of the contract, which read as follows:

"This contract and memorandum of agreement made and entered into this 24th day of May, 1913, by and between Bell Brothers and McDonald, a copartnership, of Robinson, Illinois, party of the first part, and Williams & O'Dell, a copartnership, of Evanston, Illinois, party of the second part, and the Wichita Natural Gas Company, a corporation, hereinafter called the vendee, party of the third part, witnesseth:

"That whereas, party of the first part owns and controls certain leases and gas production in Township Thirty-three (33) North, Range Ten (10) East, Chautauqua County, Kansas, (known as Summit Township) [which adjoins that in which Sedan is situated] and propose to acquire other leases and develop gas production in said Township, and desire a market for gas so owned and produced, and,

"Whereas, party of the second part now owns and controls certain gas leases and gas production in the same said Township Thirty-three (33) North, Range Ten (10) East, Chautauqua County, Kansas, (known as Summit township) and proposes to acquire further leases and develop additional production of gas in the same territory, and desires a market for its present production and the production it may acquire as aforesaid, and,

"Whereas, said Wichita Natural Gas Company, party of the third part, owns and controls certain pipe-lines for the transmission of natural gas and desires to purchase gas for distribution;

"Now therefore, this agreement witnesseth: That the parties hereto for and in consideration of the covenants and agreements hereinafter set forth and contained, as well as of the mutuality hereof, have covenanted, promised and agreed to and with each other as follows:

"FIRST.

"Parties of the first and second part agree to secure all necessary rights-of-way for a pipe-line to be built by the vendee, as hereinafter set

out, connecting the said vendee's present pipe-line to the territory where the leases and production of the parties of the first and second part are located, as above set out, and to secure for the said vendee sufficient land for the location of a pump-station at such places as the vendee shall designate, the actual cost of the said rights-of-way and land so secured is to be borne by the vendee. Said parties of the first and second part shall at all times acquaint the vendee of the cost and expense necessary and occasioned in the securing of said rights-of-way and land.

### "SECOND.

"The vendee agrees to begin the laying and construction of a six-inch pipe-line and gas pumping station upon the right-of-way and land indicated in the foregoing paragraph, together with necessary field lines, or the equivalent of a six-inch diameter as a main truck or gathering line, with branches of smaller size, to the wells of the parties of the first and second parts, within the territory above described. It is understood that the plant is to be so constructed as to have a capacity to handle a minimum of Five Million (5,000,000) cubic feet daily of two (2) pound gas, based on an intake pressure at the compressor station of one hundred (100) pounds. The station and plant to be of ample proportions to deliver the said minimum quantity of gas against such pressure as may be existing in the main pipe-line of the said Wichita Natural Gas Company.

### "THIRD.

"Party of the first part agrees to sell unto the vendee, and to deliver into its pipe-line system, through orifice meters, as hereinafter set out, all the gas produced or acquired within the above mentioned territory, subject to the limitations as to quantity as hereinafter set out; and party vendee agrees to pay for such dry and merchantable gas so furnished, three and one-half (3½) cents per thousand cubic feet of two-pound gas.

### "FOURTH.

"Party of the second part agrees to sell unto the vendee, and to deliver into its pipe-line system, through orifice meters, as hereinafter set out, all the gas produced or acquired within the above mentioned territory, subject to the limitations as to quantity as hereinafter set out; and party vendee agrees to pay for such dry and merchantable gas so furnished, three and one-half (3½) cents per thousand cubic feet of two-pound gas.

### "FIFTH.

"The vendee agrees that the total amount of gas purchased from both first and second parties shall be a minimum amount of Five Million (5,000,000) cubic feet daily, providing, the said parties of the first and second part kept their open flow capacity six (6) times or more in volume the quantity which the said vendee is drawing from the parties of the first and second parts; that is to say, for example, that the parties of the first and second parts are to have a combined open flow of Thirty Million (30,000,000) cubic feet before the vendee is obligated to take Five Million (5,000,000) cubic feet daily. It is distinctly understood and

Ely v. Gas Co.

agreed that the vendee shall take gas from the party of the first part and the party of the second part in such proportion as the open flow capacity of each party is to the total required open capacity; that is to say, for example, if each of the parties first and second part, has Fifteen Million (15,000,000) cubic feet open flow capacity of the wells, then the vendee is to take one-half (½) of the Five Million (5,000,000) cubic feet minimum from each party, and thus, as the open flow capacity of the party of the first part and party of the second part varies, so will vary the difference of the amount of gas taken by the vendee from the parties of the first and second parts.

"Provided, the gas production of the parties of the first and second parts hereto is capable of delivering its said proportion into the pipe line of the vendee against the intake pressure whatever it may be.

"It is further agreed that in the event either the party of the first part or the party of the second part can not furnish its proportion of open flow capacity, then the vendee shall have the right to take the balance from the other party, and in case both parties of the first and second parts cannot furnish the minimum of Thirty Million (30,000,000) cubic feet open flow and Five Million (5,000,000) cubic feet of gas per day, then the vendee shall have the right to purchase gas within the said territory from an outside party, or parties.

"SIXTH.

"The vendee shall maintain and keep in proper repair such orifice meters, of a suitable size and of such a type as vendee shall select and approve, which said meters shall be placed at such places and in such manner as vendee shall deem proper and necessary.

"SEVENTH.

"That as often as once a day, after said vendee begins taking gas under this contract, it shall cause all meters to be carefully and accurately read by some competent and duly accredited agent or employe, and during the term of this contract, shall keep, at its office, an accurate, correct and permanent record of said readings, and shall forward, by United States mail to party of the first part and party of the second part, on or before the second day of each week, a correct statement of the amount of gas taken by or delivered to it during the preceding week from the party so informed, and the said parties of the first part and second part shall have access to said records at all times, during business hours, for the purpose of ascertaining the amount of gas which has been or is being taken and delivered under this contract.

"Each and every successive reading of any meter shall be final and conclusive upon both parties, unless objections, in writing are made by one of the parties hereto and served upon the vendee, at its office in Bartlesville, Oklahoma, within ten days after the reading complained of was taken, stating specifically the particulars of such objections and identifying the meter against which complaint is lodged, in which case the reading of the meter so objected to shall not be conclusive, but shall remain open for readjustment from the testing of such meter.

Ely v. Gas Co.

"It is further agreed that the meters so furnished and used shall be kept in such good working order and efficiency that they will register within three (3) per cent of the actual amount of gas passed through them. In case a meter shall be found defective, or ceases to register until the same can be repaired or replaced, the quantity of gas delivered shall be ascertained by the average of another meter, or by the amount delivered for the same service during a succeeding corresponding period. In the event of the party of the first or second parts dissatisfaction with the accuracy of the meter, the vendee will, upon written application at its office, have, within fifteen days, the same tested in place, or if necessary, removed to the shop and tested. In the event party of the first or second parts complain of the meter, and cause a test to be made as above mentioned, and same shall be found to be within three per cent correct, then the party complaining shall pay the cost and expense of having the test made.

### "EIGHTH.

"All bills for gas delivered hereunder shall be due on the Twentieth (20th) day of the month following that in which the gas was furnished, and all payments of such bills shall be made, either by check of the vendee, or by draft, on or before the Twenty-fifth (25th) day of the month following that in which the gas is delivered.

### "NINTH.

"The vendee shall not be liable to the party of the first part, or the party of the second part, or to any person whomsoever, for any damage, injury or loss arising, or resulting from said gas, or the use thereof, before it passes through the meters herein provided for.

### "TENTH.

"In consideration of the purchase of the gas as herein provided for, party of the first part agrees for itself, and party of the second part agrees for itself, not to sell any gas produced within this said mentioned territory to any other person or party than the vendee named herein; and the said vendee agrees not to purchase gas from any other person or party than the party of the first part, and the party of the second part, unless they fail to deliver the said minimum of Five Million (5,000,-000) cubic feet daily capacity.

### "ELEVENTH.

"It is understood and agreed that this contract shall be binding upon the parties hereto, their heirs, successors and assigns for as long as the field covered as above set out will produce gas in quantities and under conditions that render it profitable to both parties to produce and transport it.

### "TWELFTH.

"Parties of the first and second part acknowledge that the transportation of gas over long distance, and the operation of compressor plants, are subject to accident, interruption, labor troubles, and other difficulties, and the said vendee, by this contract, only obligates itself to carry out

16—99 KAN.

the terms thereof in so far as it can reasonably do, subject always to strikes, accidents and casualties beyond its control.

### "THIRTEENTH.

"Parties of the first part and second part in further consideration of the covenants and stipulations herein contained, agree to proceed without delay to further drilling operations, in a *bona fide* effort to increase, at as early a date as possible, the open flow production of gas to Thirty Million (30,000,000) cubic feet per day.

### "FOURTEENTH.

"Vendee agrees that upon the signing and delivery of this agreement by all the parties thereto, that it will proceed to the construction of its pipe-lines and the laying of the gas line as proposed herein, by placing orders for material and using all due diligence necessary to a speedy installation of the plant as hereinbefore set out.

### "FIFTEENTH.

"It is agreed that time is and shall be of the essence of this contract."

The trial court, in its findings of fact, describes the contract as one "selling" certain gas. The document itself speaks of the parties of the first and second part as agreeing "to sell" and deliver the gas. (Third and fourth paragraphs.) But language used by the parties to designate the transaction is not conclusive. (35 Cyc. 276.) It seems quite clear, however, that the contract did not contemplate an immediate passing of the title to any of the gas. The agreement of the company that the amount purchased should be a minimum of 5,000,000 cubic feet was conditioned upon an extent of production that might never have been reached. When the contract was signed the plaintiffs had four producing wells. When gas was turned into the defendant's line, in October, 1913, they had seventeen or eighteen, producing 65,000,000 feet, open flow. The plaintiffs contend that by providing a number of wells sufficient to produce the flow (30,000,000 cubic feet) necessary under the contract to entitle them to require the company to take the 5,000,000 feet daily minimum, they had in effect reduced the gas to possession—converted it into personal property ready for delivery, and that the situation was brought within the rule by which, under a contract for the sale of goods not in existence but to be produced by the seller, the title is ordinarily deemed to pass as soon as the contract comes to relate to specific ascertained goods. (*Stewart v. Produce Co.*, 88 Kan. 521, 129 Pac. 181.) The rule referred to is not absolute, being merely a guide to assist in ascertaining the real intention of

the parties, which is the controlling element. (Note to case last cited, 50 L. R. A., n. s., 111.) We do not think the bringing in of any number of wells, whatever their production, can be regarded as reducing to possession all the gas within a designated area, or as converting it into personalty, or into specific ascertained property. The quantity can not be definitely determined, and there is always the possibility of its escaping or being diverted through wells drilled on other land. (See citations collected in *Kansas Natural Gas Co. v. Haskell,* 172 Fed. 545, 563; *Gas Co. v. Neosho County,* 75 Kan. 335, 89 Pac. 750; Thornton, The Law Relating to Oil and Gas, 2d ed., §§ 21, 22.) Decisions are cited in behalf of the plaintiffs to support the proposition that oil and gas become personal property "when discovered and reduced to possession either in the wells or in pipes or tanks." None of them, however, extends the principle to gas in place, although an outlet through wells has been provided. In typical instances the language of the court was:

"Petroleum oil is a mineral, and while in the earth it is part of the realty, and should it move from place to place by percolation or otherwise, it forms part of that tract of land in which it tarries for the time being, and if it moves to the next adjoining tract, it becomes part and parcel of that tract; and it forms part of some tract, until it reaches a well and is raised to the surface, and then for the first time it becomes the subject of distinct ownership separate from the realty, and becomes personal property, the property of the person into whose well it came. And this is so whether the oil moves, percolates, or exists in pools or deposits. In either event, it is property of, and belongs to, the person who reaches it by means of a well, and severs it from the realty and converts it into personalty." *(Kelley v. The Ohio Oil Co.,* 57 Ohio St. 317, 328.)

"The peculiar, wandering character of gas and oil precludes ownership in their natural state, and hence they are not the subjects of sale and conveyances until they have been reduced to possession and placed under control by being diverted from their natural paths into artificial receptacles." *(New American Oil, etc., Co. v. Troyer,* 166 Ind. 402, 411.)

Other features of the contract tend to sustain the view that it was executory—that the plaintiffs undertook to sell gas to the defendant as it was furnished, rather than to transfer title in the mass. The preamble recited that they proposed to acquire other leases than those they then held, and to develop additional production, and that they desired a market for their present and future production. They were not limited in their opera-

tion to what they already possessed. If they at any time had found themselves unable to furnish 5,000,000 cubic feet of gas from their then holdings the contract clearly authorized them to deliver to the defendant gas obtained under new leases.

The provision of the contract (tenth paragraph) that the plaintiffs should not sell gas from the territory described to any one but the defendant, whether valid or otherwise, carries no implication that the title had already passed from them. They could contract not to sell property which they owned, just as they could contract to sell it. Indeed, if they no longer had title their agreement that they would not make a sale elsewhere was entirely superfluous.

It would serve little purpose to undertake a review of cases arising under contracts relating to the sale of different kinds of products or merchandise. Their analogy to the present case in most instances is incomplete. As there was no way of ascertaining the quantity of gas underlying the tracts covered by the plaintiffs' leases, or tapped by their wells, or of segregating or measuring any part of it except as it should be stored in pipes or tanks, we think the title passed only as delivery was made and measurement had, and the contract remained executory except as to the gas actually delivered. This conclusion of course interposes no obstacle to a recovery by the plaintiffs of any damages they may have suffered by the defendant's breach of the contract, a remedy just as adequate as that sought in these actions, although involving a more complicated inquiry for its enforcement.

2. The trial court made a number of findings of fact, among which were the following, which bear upon the issue whether the quality of the gas was such that the defendant was justified in refusing to accept and pay for it, in other words whether the gas was "merchantable" within the meaning of that word as used in the contract:

"The gas produced by plaintiffs in the Sedan field and which was sold to defendant was dry gas and contained from 500 to 550 B. T. U's. [British Thermal Units] per cubic foot.

"The balance of the gas purchased by defendant to supply its customers or produced by itself for like purposes contained about 1000 B. T. U's. per cubic foot.

"The gas produced by plaintiffs burned satisfactorily and made good heat and light when not mixed with other gas.

"The gas produced by plaintiffs, when run into pipe-lines along with gas containing 1000 B. T. U's. resulted in a variable gas that did not burn satisfactorily or give good light or heat, but would frequently go entirely out after being lighted.

"The two grades of gas did not mix thoroughly when run into the pipeline together, owing to the variation in pressure maintained in the line, so that part of the time the high grade gas was going through the mixers of consumers and part of the time the low grade was going through, and the change from one kind to the other, each requiring a different air adjustment of the mixers, caused the fires to go out.

"Natural gas possessing 500 B. T. U's. per cubic foot has a commercial value in Sedan, Kansas, and vicinity, and is reasonably fit for use as fuel and light.

"At the time of entering into the contract referred to in finding No. 1, none of the parties knew anything about the variation of gas in southern Kansas and Oklahoma in heat units, nor was anything known about it by any of the parties at the time of the assignment of Williams and O'Dell to Seth Ely.

"It was known to Bell Bros. & McDonald, and Williams and O'Dell at the time of making the contract referred to in finding No. 1, and to the assignee of Williams and O'Dell, Seth Ely, ever since acquiring an interest in the contract, that defendant was purchasing the gas from them for sale and distribution to gas consumers in Kansas, through a system of pipelines.

"There was no express or implied warranty in the contract in question that the gas sold to defendant would mix with a gas of a different number of heat units so as to give a satisfactory result to consumers of The Wichita Natural Gas Co., although, as a matter of fact, such gas would mix under a constant pressure in the pipeline so as to give a satisfctory result to consumers.

"The Public Utilities Commission made an order that no gas of less than 800 B. T. U's. should be sold to consumers in Kansas [except by permission of the commission]."

While no finding was made to that effect, it is agreed that the enforcement of the order of the utilities commission referred to was enjoined by the district court of Shawnee county, in an action brought by Seth Ely, and that no appeal was taken from the judgment in that case. The trial court in the present cases stated as conclusions of law that the order of the utilities commission, forbidding the sale without its consent of gas containing less than 800 British thermal units, was void, being in excess of its authority, and that the gas produced by the plaintiff was merchantable within the meaning of the contract. The authority of the utilities commission to regulate the sale of natural gas of a low heat-producing quality need

not be considered. The order that was made must be disregarded at least as to plaintiff Ely, since its enforcement against him has been enjoined. The question to be determined is whether under the findings the gas furnished by the plaintiffs met the requirement as to merchantability. The contract is to be interpreted in the light of the fact that all parties knew the use that was to be made of the gas—that it was to be distributed through a system of pipe lines for sale at distant places—and must be deemed to have entered into the agreement in contemplation of that use. Evidence was given in behalf of the defendant that it received many well-founded complaints, which it attributed to conditions resulting from the quality of the gas furnished by the plaintiffs. The substantial acceptance by the trial court of this portion of the testimony is shown by the finding that this gas, when run into pipe lines with that of a higher heat-producing quality, resulted in a variable gas, which did not burn satisfactorily, but would frequently go entirely out after being lighted. The findings that this happened because the two grades of gas were not thoroughly mixed, that this was due to the variation in pressure maintained in the line, and that the maintenance of a constant pressure would result in a mixture that would avoid the difficulty, imply that the court held it to be incumbent upon the defendant, in a reasonable effort to market the gas obtained from the plaintiff with that procured from other sources, to bring about a complete mixture of the two grades of gas by subjecting them to a constant pressure. No finding was made as to the amount of trouble or expense this would occasion, and in support of the judgment the plaintiffs are entitled to the most favorable construction the evidence will bear on this point. But apart from any question of the obligation of the defendant to make any special provision to enable it to handle this particular gas, the matter is affected by another consideration. We do not think gas can be said to be "merchantable" within the meaning of this contract, merely because it will burn, and is capable of producing light and heat, and can be sold and used for that purpose. The term quoted usually carries an implication of quality—that the article to which it is applied conforms to ordinary and reasonable standards—that it is substantially of the average grade or value of simi-

lar goods sold in the same market. "Where it is provided that the articles sold shall be 'merchantable,' the articles must be of a quality such as is generally sold in the market and suit- able for the purpose for which they are intended, although not of the best quality." (35 Cyc. 219.) Webster's definition is "fit for market; such as is usually sold in market, or such as will bring the ordinary price." Black's Law Dictionary gives: "Fit for sale; vendible in market; of a quality such as will bring the ordinary market price." "In mercantile contracts, the term denotes the stableness of the goods, and signifies ordinary quality or medium quality of goodness, salability, etc." (27 Cyc. 481, Note 41.) It has been held to mean "such as could be sold in the market at the usual and ordinary price." (*Walton & James v. Black*, [5 Houston] 9 Del. 149. To the same effect see *Liston v. Chapman & Dewey Land Co.*, 77 Ark. 116; *The Atkins Bros. Co. v. Grain Co.*, 119 Mo. App. 119.) We think the word must in the present case be construed as relating to the grade of the gas, and as requiring such a quality as could be sold at the ordinary price, without abatement for its failure to measure up to the general standard. The gas procured by the defendant from other sources contained about 1000 British thermal units; that furnished by the plaintiffs but 500 or 550. The latter, therefore, had but little over half the heat-producing value of the gas ordinarily used for the same purposes. Regardless of any order of the utilities com- mission, the defendant could not fairly and rightfully sell such gas to its customers for the same price charged for the ordi- nary gas, which was of nearly twice its value to the user. The defendant was contracting for gas that reasonably and sub- stantially corresponded in grade with that generally handled in the territory in which it operated. The parties can not be regarded as having contemplated that the defendant was to be put to the necessity of either selling this product to its cus- tomers at a less price than it charged for ordinary gas, or of mixing it in with all its other supply, thereby producing a hom- ogeneous mixture of intermediate value to be sold at a reduc- tion corresponding to the infusion of inferior gas, or at the original flat rate, which would be unfair to the consumer. We can not regard the defendant as having assumed an obligation that bound him to either of these lines of conduct. Nor are

the rights of the parties affected by the fact that the general knowledge of the tests by which the heat-producing quality of a gas is determined in British thermal units has been developed since the contract was entered into. The defendant agreed to take and pay for merchantable gas—gas of approximately average quality. If that offered was actually of inferior grade the circumstance that the means for discovering the fact were not presently at hand could not prevent its taking advantage of later information on the subject. The findings that the gas produced by the plaintiffs contained not more than 550 British thermal units per cubic foot, while that from other sources contained about 1000, compels the conclusion as a matter of law that it was not merchantable within the meaning of the contract, and the defendant can not be held liable for refusing to take and pay for it.

The judgment is therefore reversed, and the cause remanded with directions to render judgment for the defendant.