No. 45,566

HARRY G. McAFEE and NONA McAFEE, Husband and Wife, *Plaintiffs,* v. THE CITY OF GARNETT, KANSAS, a Municipal Corporation, *Appellant,* v. CITIES SERVICE GAS COMPANY, a Corporation, *Appellee.*

(469 P. 2d 295)

Opinion filed May 9, 1970.

*Leonard O. Thomas,* of Weeks, Thomas, Lysaught, Bingham & Johnston, Chartered, of Kansas City, argued the cause, and *Clark Howerton,* of Garnett, and *Richard O. Skoog,* of Ottawa, were with him on the brief for the appellant.

*Blake A. Williamson,* of Williamson, Cubbison, Hardy & Crossette, of Kansas City, argued the cause, and *Jack W. Wertz* and *Frank O. Hamilton,* both of Oklahoma City, Oklahoma, were with him on the brief for the appellee.

The opinion of the court was delivered by

FONTRON, J.: Only two parties are concerned in this appeal, the City of Garnett, Kansas, and Cities Service Gas Company, to whom we shall hereafter refer as City, or plaintiff and Cities Service, or defendant. The trial court entered summary judgment in favor of Cities Service and the City has appealed.

The sequence of events forming the background of this case is as follows: Prior to 1947 the City, which owns the natural gas distribution plant supplying gas to its residents, obtained its gas supply from nearby wells, with Cities Service being on a standby basis. During that period the City odorized the gas before distributing it to its customers.

On June of that year, the City and Cities Service entered into an agreement in which Cities Service agreed to supply the City with sufficient natural gas of merchantable quality for all its needs. At this point the City ceased odorizing the gas in its distribution system.

Apparently all went well until the late fall of 1964, when an explosion occurred at the home of the Maddy family, the cause of which was never determined. On the evening of January 5, 1965, a floor furnace flared up in the house owned by the McAfees, situated across the street from the Maddy residence. The McAfee house was rented at the time to the Wallace family. Immediately after the flare-up, Mr. Wallace turned off the gas and the following morning a check was made by the superintendent of the City gas plant and a plumber, who was called in to help. These two men detected no problems and the gas was turned on again later in the day.

On the same evening, January 6, 1965, an explosion occurred killing one of the Wallace sons and severely injuring Mr. Wallace and their other boy. The Wallaces, who subsequently moved from Garnett, brought an action in federal court against the City to recover damages for the death of the child and for the personal injuries sustained by Mr. Wallace and the surviving son. Mr. and Mrs. McAfee also filed suit against the City to recover damages resulting to their house, but their action was filed in the District Court of Anderson County, Kansas.

In both actions, the one by the Wallaces in federal court and the one by the McAfees in state court, the City filed third-party petitions against Cities Service, contending that Cities Service had breached its obligation to furnish the City with natural gas of merchantable quality and praying that in the event judgments be rendered against the City that then it recover judgment against Cities Service in like sum or sums. In federal court, the Wallace action against the City was separated for trial from the third-party suit by the City against Cities Service, and we are advised that judgments were entered therein against the City in amounts totaling $148,000. The third party claim of the City against Cities Service is still pending in federal court, apparently awaiting the outcome of this appeal.

The action brought by the McAfees against the City in the state court was separately tried and resulted in a judgment against the city for $9,000. No appeal has been taken from that judgment. Thereafter, Cities Service filed a motion for summary judgment in response to the third-party claim of the City. In ruling on this motion the trial court had before it not only the pleadings in this case, but also, by stipulation, the transcript of the federal case, including the discovery proceedings, so far as they were relevant to this case.

Summary judgment was entered by the court in favor of Cities Service on the ground that there remained no genuine issue of material fact between the parties. In entering judgment the trial court filed a comprehensive memorandum opinion to which we shall refer as needed. As we have said, the City has appealed.

The main thrust of the City's argument may be stated this way: That Cities Service, by failing to odorize the gas before delivery to the City distribution plant, thereby breached its contractual duty to deliver gas of merchantable quality. The argument in this regard is three pronged: First, that natural gas with no odor is dangerous for distribution to consumers; second, that gas which is dangerous for consumers to use is not fit for its intended purpose; and third, that gas not fit for its intended purpose is not of merchantable quality.

Cities Service makes no contention that the gas supplied to the City had been odorized by means of an additive, or malodorant as it is sometimes called, but maintains that odorization has nothing to do with its merchantable quality, within the meaning of its contract. Hence, Cities Service argues that its failure to odorize the

gas before delivery to the City does not constitute a breach of its warranty to supply gas of merchantable quality.

The question then, in our opinion, narrows down to this: Was the gas delivered to the City, without the addition of a malodorant, of merchantable quality within the intendment of the contract? Or, to phrase the query in a slightly different context, can it be said the delivery of odorized gas was within the contemplation of the parties when they entered into their agreement?

Before proceeding to examine certain portions of the evidence deemed pertinent, we refer to the rule that in the construction of contracts, primary focus must be directed toward ascertaining the intention of the parties as gathered from the subject matter of the agreement, the language employed and the surrounding circumstances. (*Stevens v. Farmers Elevator Mutual Ins. Co.*, 197 Kan. 74, 76, 415 P. 2d 236; *New Hampshire Ins. Co. v. Fox Midwest Theatres, Inc.*, 203 Kan. 721, 457 P. 2d 133.

So far as relevant to the question before us, the provision of the contract as to merchantability is set forth in these words:

"The natural gas supplied hereunder shall be of a merchantable quality and shall have a system wide weighted average total heat content of not less than nine hundred thirty-four (934) British Thermal Units per cubic foot saturated with water vapor under the standard measurement next recited. . . ."

According to the experts produced by Cities Service, it appears that the natural gas sold to the City comes from the Oklahoma Hugoton gas field and is relatively free from sulphur, itself a potent source of stench; and that Cities Service produces no gas itself but buys it either at the wellhead or at the tailgate of a processing plant. After coming from the well, the gas is processed to extract some of the liquefiable carbons, which give natural gas its odor, and which otherwise would normally drop out in transmission. Some two-thirds of the heavier hydrocarbons are removed from the gas, in such form as propane, butane, etc., which reduces the odor by such percentage. No malodorizing agent is added to the gas as it is transported through the pipeline, although the gas still retains a perceptible odor.

Further statements by defense experts were that due to pressure and to temperature changes in the pipeline, heavier hydrocarbons from the gas stream tended to condense, thus becoming liquid and interfering with the gas flow; that to maintain the pipeline in best operating condition it is necessary to remove the hydrocarbons

from the gas; that the Kansas Corporation Commission has no regulations requiring that gas be odorized before delivery to a retail gas distribution plant and that such would be highly impractical; that for effectiveness, natural gas must be odorized at the last possible moment before delivery to the consumer; that much of the odorant would disappear during transmission and storage, making it impossible to maintain a uniform level of odor; and that from time to time the gas may move in either direction, which would result in a double dose.

A good deal of the evidence introduced by Cities Service through expert testimony was in the realm of custom and practice in the natural gas industry. For example, Mr. Hofsess, a graduate engineer with long experience and now an executive of the defendant company, testified that it is and has always been the practice in the industry that odorization is the responsibility of the retail distributor; that interstate pipeline companies operating in Kansas have never odorized natural gas supplied to retail distributors for resale to consumers; that the provisions as to quality found in the City's contract are those contained in their Federal Power Commission Gas Tariff and are incorporated in every contract under which the company sells gas for resale. The witness then pointed out similar provisions with respect to merchantability in the tariffs of other pipeline companies operating in this general area, none of whom odorized their natural gas.

Mr. Hofsess further testified that no officer, agent or employee of the City had ever requested Cities Service to odorize the gas supplied to it, and that the city itself began odorizing gas immediately after the McAfee explosion occurred.

On the other side of the coin, the City produced the affidavit of another expert, Mr. Fowler, with a degree in chemical engineering and with experience in the petroleum industry. He stated that safety standards required that gas transmitted for consumption be odorized so it is smellable in concentrations greater than one-fifth of the lower explosive limit and "gas not so odorized is not merchantable for the reason that the gas that does not meet this minimum standard should not be introduced into distribution lines"; such gas, if it escapes undetected, could cause great damage; that gas as it comes from the well before processing would approach or exceed the minimum odorization standard; after processing, the gas is substantially odor free and should not be delivered to

consumers through distribution or household lines; that gas which had been processed is properly called processed rather than natural gas; Mr. Fowler summarized by stating:

"Any gas processed in the manner described by Mr. Hofsess and introduced into the distribution system would be unsafe and, therefore, not merchantable."

We are of the opinion that the test of "gas of merchantable quality" in this case must be determined within the context of its meaning, use and acceptance in the natural gas trade or business. This view accords with the general law in this area as well as with our own decisions. In *Francis v. Shawnee Mission Rural High School*, 161 Kan. 634, 170 P. 2d 807, the opinion hinged on what was intended by the phrase "for the school year" which was used in the contract of employment under which the plaintiff school teacher was employed. On page 638 this court said:

". . . It may be assumed in the absence of evidence to the contrary, that when members of a trade or business employ trade terms in their contracts with one another they attach to them their trade significance. . . ." (p. 638.)

The general rule is expressed in 25 C. J. S., Customs and Usages, § 21, pp. 145, 146, in this language:

". . . In the absence of an express or implied stipulation to the contrary in the agreement, persons engaged in the same trade or business are deemed or presumed to have contracted with reference to particular customs or usages of the trade, and it is competent to resort to such customs or usages to interpret the contract; and where a person deals in a particular market, he is deemed to deal according to the general customs or usages of that market in the absence of a stipulation to the contrary, and such customs or usages are admissible to explain the contract."

To similar effect we find the rule phrased in this statement set forth in 17 Am. Jur. 2d, Contracts, § 251, p. 643:

"Although words in a contract are generally to be given their usual and primary meaning at the time of the execution of the contract, words of art or words connected with a particular or peculiar trade are to be given the signification attached to them by experts in such art or trade, unless it appears that they were used in a different sense. . . ."

It is true that the terms "merchantable" and "merchantable quality" are not the exclusive property of those engaged in the natural gas business. The words are, in fact, words of general circulation with widespread import. Generally speaking, we believe it may be said that "merchantable" may be equated with "salable" or "marketable." In *Foote v. Wilson*, 104 Kan. 191, 178

Pac. 430, we said that "salable" was the equivalent of "merchantable", which "in all the dictionaries and to the common understanding means, as applied to commercial transactions, fit for sale in usual course of trade, at usual selling prices." (p. 193.) In an earlier case, *Ely v. Gas Co.*, 99 Kan. 236, 161 Pac. 649, which involved the sale of natural gas, it was said:

". . . The term [merchantable] . . . usually carries an implciation of quality—that the article to which it is applied conforms to ordinary and reasonable standards—that it is substantially of the average grade or value of similar goods sold in the same market. 'Where it is provided that the articles sold shall be "merchantable," the articles must be of a quality such as is generally sold in the market and suitable for the purpose for which they are intended, although not of the best quality.' (35 Cyc. 219.) . . ." (pp. 246, 247.)

Usual definitions, or tests of merchantability, hardly fit the circumstances of this case or the situation of these parties, for there is no contention here as to the quality of the gas itself. No claim is advanced that the heat content did not measure up to the warranty of 934 B. T. U., or that the product would fail in other particulars to do the job for which gas is normally employed. This is born out by the fact that for seventeen years the City distributed natural gas for the use of its customers without taint of complaint, so far as the record shows, concerning its quality or effectiveness. In this respect the present case differs radically from *Ely v. Gas Co.*, supra, where the B. T. U. content was far below that of gas from other sources, with little more than half the heat-producing value of gas ordinarily used for the same purposes.

In this case, the dispute hinged not on British Thermal Units, or combustibility, but over the addition of a smelly odorant. Hence, as applied to the sale of natural gas by a carrier to a distributor, we view the expression "gas of merchantable quality" as one of art, the import of which must be deduced within the framework of the industry using the term.

The evidence of defense experts stands uncontroverted as to the necessity of removing heavier hydrocarbons from the natural gas stream to maintain a pipeline in good operating condition, and that the extraction of heavy hydrocarbons has been a universal practice in the industry for many years; that there has never been a regulation in Kansas requiring natural gas to be odorized before delivery by the carrier to a retail gas distribution system, and that such a requirement would be highly impractical; that odorization in Kansas

has always been the responsibility of the distributor; and that odorization to be effective should be performed at the last possible point before it reaches the consumer.

We believe this evidence justifies the conclusion that the term "natural gas . . . of a merchantable quality" as used in the Cities Service contract, and as contemplated by these parties, both of whom must be said to be in the gas industry, did not refer to malodorized gas as it came from the carrier's pipeline. The plaintiff, however, maintains that Mr. Fowler, its expert, expressed a contrary opinion, thus presenting a factual question to be determind.

Frankly, we cannot view the Fowler deposition in this light. We observe that nowhere in his affidavit does he squarely meet the issue of "merchantable quality" so far as this term is used in the industry with respect to a pipeline carrier, or as to what is customary within the trade relating to the odorization of gas as between carrier and distributor. Mr. Fowler was careful in saying that gas not odorized is not merchantable for the reason *that it should not be introduced into distribution lines,* and that gas processed in the manner described by Mr. Hofsess *and introduced into the distribution system* would be unsafe and therefore not merchantable. He refrained from saying, however, what merchantability means as to gas in the pipeline, and made no attempt to dispute those portions of the Hofsess deposition which pointed up the impracticability of pipelining odorized gas to distribution plants.

We presume that Mr. Fowler, as an expert in the field, would be aware of the practical problems involved in transporting odorized gas by pipeline over many miles, to many distribution centers and under variable conditions, as well as of the customs and usages of the industry itself, and that his opinions were phrased within that frame of reference. This view, we believe, finds support from the manner in which the affiant linked the concept of merchantability with gas in the distribution lines. Appraising Mr. Fowler's affidavit in this context, we find no essential conflict with the views expressed by the other experts.

In this connection we take note of § 703 of the Rules and Regulations of the Kansas Corporation Commission Relating to Standards of Quality, Pressure, Accuracy of Measurement, Safety and Service of Natural Gas in the State of Kansas, Docket 34,856-U, effective January 16, 1961, as well as the American Standard Code for Pressure Piping, the so-called "industry bible" so forcefully flourished

by defense counsel during his oral presentation. The provisions of both read:

"Any gas *distributed to customers* under the General Gas Service classification *through gas mains or gas services or used for domestic purposes* in compressor plants, which does not naturally possess a distinctive odor to the extent that its presence in the atmosphere is readily detectable at all gas concentrations of one-fifth of the lower explosive limit and above, shall have an odorant added to it to make it so detectable. . . ." (Emphasis supplied.)

In addition, the Kansas Regulations, of which we take judicial notice pursuant to K. S. A. 60-409 and 60-412, contain the following:

§ 703 (continued.) ". . . Odorization is not necessary, however, for such gas as is delivered for further processing or use where the odorant would serve no useful purpose as a warning agent.

§ 205. "A Pipeline or Transmission Line is a pipeline installed for the purpose of transmitting gas from a source or sources of supply to one or more distribution centers or to one or more large volume customers or a pipeline installed to interconnect sources of supply. In typical cases pipelines differ from gas mains in that they operate at higher pressures, they are longer, and the distance between connections is greater.

§ 206. "A Gas Main or Distribution Main is a pipeline installed in a community to convey gas to individual services or other mains."

The foregoing excerpts taken from the Corporation Commission's rules and regulations and from the "industry bible" strengthen us in our belief that views expressed by Mr. Fowler relate to gas in the distribution lines serving the ultimate consumer rather than to gas flowing from the mouth of a pipeline.

We are aware of the City's argument that should we reject its contention that the gas supplied by Cities Service was unmerchantable as a matter of law, there would still remain a question of fact to be determined. We would agree, that where a factual dispute exists, it is for the jury or other trier of the facts to resolve the conflict. This rule is too well imbedded in our law to require additional citation in this opinion.

However the trial court found that no issue of material fact remained as to this issue, and in this we believe the court was correct. In such a case the question of interpretation becomes one of law for the court to determine. (*Morgan v. Wheeler*, 150 Kan. 667, 95 P. 2d 320.)

Consideration has been given to authorities from other jurisdictions cited by plaintiff as supporting its position that Cities Service was under a contractual duty to supply it with malodorized gas. We deem none of the authorities in point. Each case involved

liquid petroleum gas, not natural gas. Of greater importance, however, in each case the action was initiated by the victim of an explosion, and recovery of damages was sought on the ground of negligence. Such is not the case here. The City's third-party action against Cities Service is not based on negligence, but on indemnity, for we adhere to the rule that the right of contribution does not exist between joint tort-feasors. (*Alseike v. Miller,* 196 Kan. 547, 412 P. 2d 1007; *Denneler v. Aubel Ditching Service, Inc.,* 203 Kan. 117, 453 P. 2d 88.) It is on the basis of indemnity for alleged breach of warranty that we must consider this action. Hence, the authorities cited are not controlling.

The City directs attention to § 22-8-2 (*a*), Rules and Regulations Relating to The Liquefied Petroleum Gas Industry of the State of Kansas, promulgated by the State Fire Marshal, which provides:

"All liquefied petroleum gases shall be effectively odorized by an approved agent of such character as to indicate positively, by distinct odor, the presence of gas down to concentration in air of not over one-fifth the lower limit of flammability. Odorization, however, is not required if harmful in the use or further processing of the liquefied petroleum gas, or if odorization will serve no useful purpose as a warning agent in such use or further processing. . . ."

This safety regulation applies by its terms to liquefied petroleum gases without distinction, but it obviously bears no relation to the transmission or sale of natural gas by a pipeline carrier. As we have said before, evidence presented in this case was to the effect that Kansas has no similar regulation respecting the odorization of natural gas in transit via pipeline.

Other points presenting questions of interest have been briefed and argued by able counsel on both sides. However, in view of the conclusion we have reached, it is needless to discuss them or to prolong this opinion.

The judgment of the trial court is affirmed.

FROMME, J., not participating.